## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ZAFRA LERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 10 C 2169 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| ALLEN M. TURNER, WARRICK L. | ) | Magistrate Judge Geraldine Soat Brown |
| CARTER, STEVEN KAPELKE, | ) | |
| ANNICE KELLY and COLUMBIA | ) | |
| COLLEGE CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Geraldine Soat Brown, United States Magistrate Judge

Before the court is Plaintiff Zafra Lerman's Renewed Motion to Compel Compliance with

the Subpoena to R. Michael DeSalle for Deposition and Production of Documents. (Pl.'s Mot.)

[Dkt 32.] Defendants Allen M. Turner, Warrick L. Carter, Steven Kapelke, Annice Kelly and

Columbia College Chicago (collectively, "defendants") have submitted certain documents for *in*

*camera* review.[1] For the reasons set forth below, the motion is granted in part and denied in part

---

[1] The parties' submissions are cited as follows: Defendants' Response to Plaintiff's Motion to Compel: "Defs.' Resp." [dkt 35]; and Plaintiff's Reply: "Pl.'s Reply" [dkt 39]. Because defendants' initial response provided no factual evidence in support, they were ordered to file a supplemental submission including any evidence (in the form of an affidavit or otherwise) in support of their claim of privilege and work-product protection. (Order, Oct. 5, 2010.) [Dkt 40.] Lerman was also given leave to file a supplemental reply. (Order, Nov. 2, 2010.) [Dkt 44.] The supplemental submissions are cited as follows: Defendants' Supplemental Brief: "Defs.' Suppl. Resp." [dkt 41]; and Lerman's Reply in Supplemental Support: "Pl.'s Suppl. Reply" [dkt 45].

without prejudice.

## BACKGROUND

Lerman was a tenured professor at defendant Columbia College Chicago ("Columbia") until 2009 when Columbia terminated her employment following an investigation into her use of grant funds. (Answer ¶¶ 2, 11, 19-20.) [Dkt 15.] To conduct its investigation, Columbia retained Matthew Crowl, an attorney with the law firm of Schiff Hardin, LLP. (Defs.' Suppl. Resp., Ex. 1, Aff. Matthew C. Crowl ¶ 3.) On October 1 and 2, 2009, Mr. Crowl interviewed several Columbia employees, including Lerman. (*Id.* ¶ 4.) It appears that he did not at that time interview Columbia's Chief Financial Officer R. Michael DeSalle, whom Lerman says had advised her on the use of grant funds. (Pl.'s Mot. at 2.) Mr. Crowl memorialized the October 1 and 2 interviews in a memorandum dated October 9, 2009, which he addressed to Columbia's General Counsel Annice Kelly (the "Crowl Report"). (Defs.' Suppl. Resp., Ex. 2.) A copy of the Crowl Report was placed in Lerman's personnel file.

Mr. Crowl attests that at the conclusion of his interview with Lerman, he informed her that "the diversion of grant monies was grounds for termination, but that she should meet with an attorney and decide whether she would prefer to resign in lieu of termination." (Crowl Aff. ¶ 5.) Columbia Provost Steven Kapelke wrote Lerman a letter dated October 5, 2009 conveying the termination decision. (Defs.' Suppl. Resp., Ex. 3.) The parties, however, dispute when Lerman was actually terminated from Columbia. Lerman filed a charge of discrimination with the EEOC on October 5, 2009, which her counsel e-mailed to Columbia that day. (Answer ¶ 24; Defs.' Suppl. Resp., Ex. 4.) On October 7, 2009, Lerman and her counsel met with representatives of the college.

(Pl.'s Mot., Ex. I at 4; Pl.'s Suppl. Reply at 5; Defs.' Suppl. Resp. at 3.) She also requested a copy of her personnel file on that date. (Defs.' Suppl. Resp., Ex. 7.) When she obtained the file on October 16, 2009, a copy of the Crowl Report was in it. (Pl.'s Mot., Ex. G; Defs.' Suppl. Resp., Ex. 8.) The Crowl Report was also submitted to the Elected Representatives of the College ("ERC") when that body reviewed Columbia's termination decision. (Pl.' Mem., Ex. I at 4, Ex. J at 8.)

Shortly after the ERC issued its findings, Lerman brought this action against Columbia and certain of its officers. (Compl.) [Dkt 1.] She alleges claims of gender, national origin and sex discrimination, civil rights violations, defamation and breach of contract, among other things. (*Id*.)

In June 2010, Lerman served a subpoena *duces tecum* on Mr. DeSalle. (Pl.'s Mot., Ex. A.) After an initial dispute among the parties as to the order of depositions, on July 29, 2010, the District Judge ordered compliance with the subpoena served on Mr. DeSalle. [Dkt 27.][2] According to Lerman, defendants thereafter delivered two documents responsive to the subpoena: a print out of Mr. DeSalle's outlook calendar data from May 2005 through October 8, 2009, and a document entitled "R. Michael DeSalle Timeline of Dr. Zafra Lerman Events" ("DeSalle Timeline") which was heavily redacted. (Pl.'s Mot. at 3 and Ex. C.). Defendants asserted attorney-client privilege and work-product protection as to other material they withheld. (Defs.' Resp. at 7-8, Defs.' Suppl. Resp. at 4-5.) They subsequently provided a log to the court specifying their claims of privilege and protection.

Lerman now moves to compel production of documents responsive to the DeSalle subpoena, and for an order overruling Columbia's attorney-client privilege and work-product protection claims

_____

[2] A review of the hearing on the prior motion reveals that the privilege issues addressed herein were not previously at issue before the District Judge. (Pl.'s Mot., Ex. B.)

as they relate to communications between Mr. DeSalle, Mr. Crowl and/or Ms. Kelly or any of their colleagues regarding Lerman's termination. (Pl.'s Mot. at 12.) Defendants' privilege log identified three documents withheld on the basis of attorney-client privilege and/or work-product protection: (1) a memorandum authored by Mr. Crowl's colleague John Tanagho memorializing Mr. Crowl's October 22, 2009 interview of Mr. DeSalle (the "Tanagho Memorandum"); (2) redacted portions of the DeSalle Timeline; and (3) a document described as a July 8, 2010 communication from Mr. Desalle to Columbia's Assistant General Counsel Paul A. Denham. Defendants submitted only the Tanagho Memorandum and the unredacted DeSalle Timeline for *in camera* review, and it appears from the parties' submissions that only those two documents remain disputed. Rulings are made, therefore, only as to those documents.

## LEGAL STANDARDS

The attorney-client privilege protects communications made in confidence by a client and a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice. *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010) (citing *Upjohn Co. v. U.S.*, 449 U.S. 383, 394-99 (1981)).[3] "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389. The privilege protects not only the giving of professional advice to those who can act on it but also the giving of information to the

---

[3] In federal court, the work-product protection as set out in Federal Rule of Civil Procedure 26(b)(3) applies. The attorney-client privilege is governed by federal common law, except that privileges are determined by state law for an element of a claim or defense as to which state law provides the rule of decision. Fed. R. Evid. 501. Although this case includes both federal and state claims, the parties do not dispute that federal privilege law applies.

lawyer to enable the lawyer to give sound and informed advice. *Id.* at 390. Factual investigations, therefore, "performed by attorneys *as attorneys* fall comfortably within the protection of the attorney-client privilege." *Sandra T.E.*, 600 F.3d at 619 (emphasis in original).

Because the privilege withholds relevant information from the fact finder, it is construed narrowly. *U.S. v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). It protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege. *Fisher v. U.S.*, 425 U.S. 391, 403 (1976). Determining if a communication falls within the protection of the attorney-client privilege requires asking: "(1) whether legal advice of any kind was sought from a professional legal adviser in his capacity as such; and (2) whether the communication was related to that purpose and made in confidence by the client." *Sandra T.E.*, 600 F.3d at 618 (internal quotations and citations omitted). The party asserting the privilege has the burden of establishing all of its elements. *U.S. v. BDO Seidman*, 337 F.3d 802, 811 (7th Cir. 2003); *U.S. v. Evans*, 113 F.3d at 1461. A blanket claim of privilege is unacceptable; rather, the claim of privilege must be made and sustained on a question-by-question or document-by-document basis. *U.S. v. Lawless*, 709 F.2d 485, 487 (7th Cir.1983).

The attorney-client privilege is "generally waived when the client asserts claims or defenses that put his attorney's advice at issue in the litigation." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1175 n. 1 (7th Cir. 1995) (citing with approval *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851 (3rd Cir. 1994)). Intentionally disclosing privileged or work-product protected materials may also waive the privilege or protection for undisclosed materials if they concern the same subject matter and ought in fairness to be considered together with the disclosed materials. Fed. R. Evid. 502.

The work-product doctrine is distinct from and broader than the attorney-client privilege. *U.S. v. Nobles*, 422 U.S. 225, 238 n. 11 (1975). The doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). At its core, the work-product doctrine shelters the mental processes of an attorney, providing a privileged area in which the attorney can analyze and prepare a client's case. *Nobles*, 422 U.S. at 238. The doctrine is an "intensely practical" one, grounded in the realities of adversary litigation. *Id*. To establish work-product protection, a party must show that the document was in fact created in anticipation of litigation. *Logan v. Com. Union Ins. Co.*, 96 F.3d 971, 976-77 (7th Cir. 1996). In determining whether the protection applies, courts look to whether "in light of the factual context 'the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation.'" *Id*. (quoting *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983)).

The work-product protection is qualified; it may be overcome if a party can establish a "substantial need" for the material and an inability to obtain equivalent materials without "undue hardship," although an attorney's "mental impressions, conclusions, opinions, or legal theories" are to be protected. Fed. R. Civ. P. 26(b)(3)(A), (B). Like the attorney-client privilege, the work-product protection may be waived. *See Nobles*, 422 U.S. at 239 (finding defendant waived work-product protection as to matters covered in investigator's testimony by presenting investigator as a witness); *Vardon Golf Co., Inc. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 534 (N.D. Ill. 2003) (finding plaintiff waived work-product protection by disclosure of information in public document obtained by adversary).

# DISCUSSION

The arguments presented in this motion are rather unusual. Lerman seeks a declaration that defendants' disclosure of the Crowl Report waived attorney-client privilege and work-product protection for Mr. Crowl's investigation materials and defendants' communications with him. Defendants argue that, because the Crowl Report was never protected from discovery in the first place, the fact that they disclosed it did not trigger a waiver of privilege or protection as to any other materials. The resulting posture here is that Lerman argues for the existence of Columbia's attorney-client privilege, while defendants argue against it.

## I.     The attorney-client privilege applied to the Crowl Report

Central to the dispute is whether the Crowl Report was privileged. Under the Seventh Circuit's decision in *Sandra T.E.*, 600 F.3d 612, that depends on Mr. Crowl's role.

In *Sandra T.E.,* the Seventh Circuit reversed a district court's order compelling the law firm of Sidley Austin LLP (then Sidley Austin Brown & Wood) to turn over materials prepared in the course of its work for the school board of the defendant District. The board had hired Sidley Austin to investigate school administrators' response to sexual abuse charges against a teacher, examine whether any employee had failed to comply with district policies or applicable laws, and analyze the effectiveness of the District's compliance procedures. *Id.* at 616. The attorneys prepared and delivered an oral report of the firm's findings at a closed executive session of the board, and later delivered to the board a written "Executive Summary" report marked "Privileged and Confidential." *Id.* In the ensuing litigation, other attorneys, not Sidley Austin, represented the District, and the plaintiff subpoenaed the Sidley Austin attorneys for their notes and memoranda. The district court

rejected Sidley Austin's claims of attorney-client privilege and work-product protection. *Id*. at 618.

The Seventh Circuit looked to the Supreme Court's ruling in *Upjohn*: when factual investigations are performed by attorneys *as attorneys*, they are protected by the attorney-client privilege. *Id.* at 619. The question, then, was whether the service provided by Sidley Austin was the factual investigation, or whether the factual investigation was a part of the legal services provided by the firm. "The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Id.* at 619 (quoting *Upjohn*, 449 U.S. at 390-91). Beginning with the firm's engagement letter, the court found that Sidley Austin's factual investigation had been the "necessary prerequisite to the provision of legal advice about how the District should respond." *Id*. at 620. The court highlighted the steps taken to maintain the confidentiality of Sidley Austin's investigation and report. No third parties had attended the witness interviews, the attorneys' oral report had been presented in a closed board session, and the written report was labeled with a "confidential" header. *Id*. Notably, the attorneys also had provided interviewees with "'*Upjohn* warnings' emphasizing that Sidley represented the School Board and not the employee and that the School Board had control over whether the conversations remained privileged." *Id*.

The facts here are similar to those in *Sandra T.E.*, although the parties' positions here invert the arguments. In order to sustain their position that they could disclose the Crowl Report without waiving attorney-client privilege and work-product protection for entries in the DeSalle Timeline and the Tanagho Memorandum, defendants assert that the purpose of Mr. Crowl's retention changed over time. Defendants say that Mr. Crowl was initially retained only to do a factual investigation to determine whether Lerman had misused grant money, and that his report simply documented the

results of that investigation. (Defs.' Resp. at 1-2.) They assert that, after Lerman filed her charge of discrimination and after she and her counsel met with representatives of the college, the nature of Mr. Crowl's retention changed, and only then did his work became legal in nature and in anticipation of litigation. (*Id.* at 8; Defs.' Suppl. Resp. at 8-9.) Lerman, on the other hand, argues that all of Mr. Crowl's work was attorney work and that in disclosing his report, defendants waived any discovery protection for communications about the investigation. (Pl.'s Mot. at 1-2, 6-7; Pl.'s Suppl. Reply at 4-5.)

The record does not support defendants' argument that Mr. Crowl was initially retained only to conduct a factual investigation into the allegations of wrongdoing against Lerman and not to give legal advice. Defendants do not submit an engagement letter or other evidence that would demonstrate the reason Mr. Crowl was retained. The evidence suggests that *before* Columbia hired Mr. Crowl, it was aware that the allegations of wrongdoing against Lerman raised a myriad of issues for the college, including legal issues. (*See, e.g.,* Pl.'s Mot., Ex. E, August 29, 2009 memorandum from Provost Kapelke to Ellen Krutz, Vice President of Human Resources, referring to "legal, managerial, ethical" problems.) It is reasonable to conclude that the purpose of Mr. Crowl's investigation was to lay the groundwork for providing legal advice.

Mr. Crowl's conduct in the investigation and the content of the report confirm that he was acting as an attorney, not simply a factual investigator, when he conducted his investigation for Columbia. It appears from the report that no third parties were present when Mr. Crowl interviewed Columbia employees. (*See* Crowl Rpt.) His report was prepared for and directed to Columbia's general counsel, Annice Kelly. (*Id.* at 1.) Mr. Crowl gave an "*Upjohn* warning" to Lerman and each of the three co-workers he interviewed that "[p]ursuant to *Upjohn*, counsel informed [the

interviewee] that Schiff Hardin and Annice Kelly represented Columbia College only, and that [they] did not represent [that individual]." (*Id*. at 1, 5, 8 and 10.) The communications reflected in the Crowl Report "concerned matters within the scope of the employees' . . . duties, and the employees themselves were sufficiently aware that they were being questioned in order that [the college] could obtain legal advice." *See Upjohn*, 449 U.S. at 394.

Defendants suggest that the change in Mr. Crowl's role occurred and his factual investigation was "completed" after his October 2 interview of Lerman because the decision to terminate Lerman had already been made. (Defs.' Suppl. Resp. at 3.) The record does not support that argument. Mr. Crowl states only that he "informed [Lerman] that the diversion of grant monies was grounds for termination, but that she should meet with an attorney and decide whether she would prefer to resign in lieu of termination." (Crowl Aff. ¶ 5.) Furthermore, Mr. Crowl continued to conduct interviews of other Columbia employees after his meeting with Lerman. (Crowl Rpt. at 10-11.) Mr. Crowl's affidavit does not state that his initial retention was not in order to give legal advice. The only document demonstrating the later investigation by Mr. Crowl, the withheld Tanagho Memorandum, also does not reflect a shift in focus. There does not appear to be any substantive difference in the nature or scope of Mr. Crowl's interview of Mr. DeSalle on October 22, 2009 as compared to interviews of other Columbia employees on October 1 and 2, 2009.

The record here leads to the conclusion that Mr. Crowl was hired to perform an investigation in order to provide legal advice about how Columbia should respond to the allegation that Lerman had misused grant money. Until it was disclosed, the Crowl Report summarizing that investigation was protected by attorney-client privilege. *See Sandra T.E.*, 600 F.3d at 620.

It is possible that the Crowl Report was also protected work product, although the record in

this respect is less clear. Mr. Crowl conducted the interviews on October 1 and 2, 2009, and his report is dated October 9, 2009. By October 9, Columbia had issued written notice of termination to Lerman, met with her and her counsel, and received notice of her charge of discrimination. Whether or not litigation was foreseeable at the time of the interviews, it was foreseeable at the time Mr. Crowl issued his report, although it has not been established whether the report was prepared because of that fact. Defendants' focus on whether legal opinions are set forth in the Crowl Report is misguided. If the Crowl Report was prepared because litigation was anticipated, it would qualify as work product. Fed. R. Civ. P. 26(b)(3)(A).

The Crowl Report is dated October 9, 2009, and Columbia shared it with Lerman on October 16, 2009 when it allowed her access to her personnel file. By then, it was clear that her position was adverse to Columbia. The termination decision had already been conveyed to her, she had filed her charge of discrimination against Columbia, and she and her counsel had met with representatives of Columbia. Columbia's inclusion of the Crowl Report in Lerman's personnel file and defendants' production of it in discovery here has waived any protection to which it was previously entitled.


## II.     The disputed materials

Having concluded that defendants intentionally produced the otherwise-privileged Crowl Report, the issue is whether, under Federal Rule of Evidence 502, defendants have waived any protection for the disputed materials. First, however, is the question whether any of defendants' withheld materials would be protected from discovery in the first place. For each item defendants withheld from discovery, they bear the burden of establishing the claimed discovery protection. *See BDO Seidman*, 337 F.3d at 811; *Logan*, 96 F.3d at 976.

A.    The Tanagho Memorandum

The Tanagho Memorandum, which describes Mr. Crowl's October 22, 2009 interview with Mr. DeSalle, would be protected by the attorney-client privilege (if protection was not waived) for the same reasons that the privilege applied to the Crowl Report. *In camera* review of the memorandum shows that Mr. Crowl questioned Mr. DeSalle, as he did in the earlier interviews, in order to supply a factual basis for providing legal advice. Like the Crowl Report, the Tanagho Memorandum memorializes that interview. Also like the Crowl Report, the Tanagho Memorandum notes that the interview was conducted confidentially and in connection with the internal investigation at the request of Columbia's general counsel Annice Kelly. Likewise, it reflects that Mr. Crowl issued the same "*Upjohn* warning" to Mr. DeSalle that he had to other employees he interviewed earlier.

The Tanagho Memorandum also would be protected work product, if protection was not waived. By the time of the interview and by the time Mr. Tanagho prepared the memorandum, Dr. Lerman had filed a charge of discrimination, and Columbia already had met with her and her counsel. Mr. Crowl was aware of the charge and the claims she had made. (Crowl Aff. ¶¶ 7, 8.) When an attorney prepares a memorandum of a witness interview with an eye toward litigation, the memorandum qualifies as work product even if the lawyer functioned primarily as an investigator. *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487, 492 (7th Cir. 1970). Attorney notes and memoranda regarding witness interviews prepared because of the prospect of litigation have long been recognized as work product. *See Hickman v. Taylor*, 329 U.S. 495, 512 (1947); *Sandra T.E.*, 600 F.3d at 622.

B.      <u>The DeSalle Timeline</u>

      1.  *Lack of evidence regarding the Timeline*

The six-page DeSalle Timeline has a number of dated typed entries and handwritten notations. Defendants have claimed privilege and/or work-product protection for each handwritten notation and many of the typed entries. The Timeline was produced to Lerman in a redacted format. Each redaction on the Timeline must be analyzed separately to determine whether protection is appropriate.

At the threshold, it is noted that defendants present no evidence as to when the DeSalle Timeline was created. Indeed, they present no factual evidence (as opposed to argument) that Mr. DeSalle even authored the Timeline, and nothing whatsoever about how he maintained it or whether it has been held in confidence since its creation. Whether the entries were created contemporaneously with the events they purport to describe is also far from clear. This failure of evidence is troubling, because defendants have the burden of proving all the elements of privilege or work-product protection. *See BDO Seidman*, 337 F.3d at 811; *Evans*, 113 F.3d at 1461. Defendants were previously ordered to submit evidence to support their claim of privilege. (*See* n. 1, *supra*.)

Because some of the redacted entries appear to reveal the substance of a confidential attorney-client communication, and in order to avoid delaying Mr. DeSalle's deposition further, the court will grant the motion to compel in part, and deny it in part without prejudice. At Mr. DeSalle's deposition, Lerman's counsel may question him about the creation of the Timeline and the way it has been maintained, as well as about the specific redactions set forth below that the court finds are not protected. If, following Mr. DeSalle's deposition, it appears that the facts do not show that the

Timeline was created and maintained in confidence, Lerman may move again for production of the entire Timeline, and Mr. DeSalle will be re-deposed on the newly-produced entries, with defendants to bear the court reporter's fees and witness fees for the additional session.

## 2. Individual redactions on the Timeline[4]

Redactions 1, 5, 10, 14, 17 and 19 are not protected by the attorney-client privilege as defendants assert. Defendants argue that the redacted handwritten notes are "a communication between the client, through Mr. DeSalle, to its attorney, the College's Assistant General Counsel." (Defs.' Resp. at 7.) According to defendants, the notes "occurred in relation to inquiries made by the Assistant General Counsel of Mr. DeSalle regarding discovery requests . . . ." (*Id.*) Defendants, however, submit no evidence to support their characterization of the notes. In the absence of such evidence, and based on the *in camera* review, it does not appear that the redacted portions convey legal advice, the request for legal advice, or the provision of information for the purpose of obtaining legal advice. *See Sandra T.E.*, 600 F.3d at 618; *McCook Metals, L.L.C. v. Alcoa, Inc.*, 192 F.R.D. 242, 253 (N.D. Ill. 2000).

Similarly, redactions 4(a), 4(b), 4(c), 9 and 11(a) are not protected from discovery. Defendants assert attorney-client privilege for these entries, describing redactions 9 and 11(a) as relating to legal strategy, but providing no context for redaction 4 at all. *In camera* review, however, demonstrates that the material relates to communications regarding the scheduling of Mr. DeSalle's meeting with Mr. Crowl. Such communications are not privileged, and the fact that Mr. DeSalle met

---

[4] The attached appendix identifies by number each redaction defendants made to the DeSalle Timeline and the corresponding ruling.

with Mr. Crowl is already known.

Redactions 8, 12(a) and 21 are not protected by the work-product doctrine, as defendants assert. Nothing in the redacted material suggests that the notes were created or reflect communications exchanged because of the prospect of litigation. The work-product doctrine serves to "shield materials that are prepared in anticipation of litigation from the opposing party, on the theory that the opponent shouldn't be allowed to take a free ride on the other party's research, or get the inside dope on that party's strategy. . . ." *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767-68 (7th Cir. 2006). Although the redactions relate to Mr. DeSalle's opinion of the investigation surrounding Lerman's termination, they are not protectable work product. Defendants' assertion of the attorney-client privilege as to redaction 12(a) is also overruled. The redacted material reflects Mr. DeSalle's observation of a conversation involving Columbia's counsel, but it does not reflect any protected communication.

Redactions 2, 3, 7(b), 11(b), 12(b), 16 and 20(b) are all handwritten notes on the margin of the DeSalle Timeline. Defendants assert that the redactions convey "notations from the College's General Counsel" Annice Kelly. (Defs.' Resp. at 7.) Defendants' log is similarly vague, and indeed, redactions 11(b) and 20(b) are not even separately reflected on the log. The copy of the Timeline produced for *in camera* review is stamped with the "received" stamp of the General Counsel's office dated July 8, 2010, however, lending credence to defendants' assertions. Because it appears those notations were added after the litigation was filed and reflect comments by the General Counsel, they are work-product protected unless that protection has been waived.

The remaining redacted portions, redactions 6, 7(a), 13, 15, 18 and 20(a), are protected from

discovery by the attorney-client privilege unless that privilege has been waived.[5]  Each of the

redacted portions reflect the confidential exchange of information between an attorney (General

Counsel Kelly or attorneys from Shiff Hardin) and employees of the client.


        C.      <u>Scope of the waiver resulting from production of the Crowl Report</u>

The final issue is whether defendants' disclosure of the Crowl Report waived applicable

discovery protections for the Tannagho Memorandum or for any of the otherwise-protected

redactions on the DeSalle Timeline.  Federal Rule of Evidence 502(a) provides:

> When the disclosure [protected by attorney-client privilege or work-product protection] is made in a Federal proceeding or to a Federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if:
>
> > (1) the waiver is intentional;
> >
> > (2) the disclosed and undisclosed communications or information concern the same subject matter; and
> >
> > (3) they ought in fairness to be considered together.

"The idea is to limit subject matter waiver to situations in which the privilege holder seeks

to use the disclosed material for advantage in the litigation but to invoke the privilege to deny its

adversary access to additional materials that could provide an important context for proper

understanding of the privileged materials."  Charles Alan Wright et al., *Federal Practice and

Procedure* vol. 8, § 2016.2 (3d ed. 1995, Suppl. 2010).  Subject matter waiver thus "is reserved for

those unusual situations in which fairness requires a further disclosure of related, protected

---

[5] Defendants also assert work-product protection for redactions 18 and 20(a).  However, that issue need not be reached for the purposes of this opinion.

information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." Fed. R. Evid. 502 advisory comm. nn. (2007).

It is undisputed that Columbia intentionally disclosed the Crowl Report to Lerman as part of her personnel file and during discovery in this case. As described above, *in camera* review of the Tanagho Memorandum shows that it concerns the same subject matter as the Crowl Report. Both documents reflect Mr. Crowl's interviews of Columbia employees regarding the claim that Lerman misused grant funds. Redaction 13 on the DeSalle Timeline appears to be Mr. DeSalle's version of the interview and concerns the same subject matter. There is no discussion in the Tanagho Memorandum or redaction 13 of Lerman's charge of discrimination.

In light of defendants' intentional production of the Crowl Report, then, the Tanagho Memorandum and redaction 13 must also be produced pursuant to Rule 502(a). Each of these items concern the same subject matter: Mr. Crowl's interviews of Columbia employees regarding the use of grant funds. It would be unfair to allow defendants to selectively produce the Crowl Report summarizing his interview of some Columbia employees, and yet withhold two other documents summarizing another interview.

Defendants' argument that they only became aware of the Tanagho Memorandum and the DeSalle Timeline after they disclosed the Crowl Report is misplaced. (*See* Defs.' Suppl. Resp. at 5.) The focus is not whether defendants knew about the other materials at the time they first produced the Crowl Report, but rather whether the production of that report was intentional, and whether the withheld materials concern the same subject matter *and* ought in fairness to be considered together with it. *See Trustees of the Elec. Workers Local No. 26 Pen. Trust Fund v. Trust Fund Advisors, Inc.,* 266 F.R.D. 1, 11 (D.D.C. 2010). The answer to those questions is yes.

The Tanagho Memorandum is a summary of the DeSalle interview. Although it is work product, *in camera* review does not show any additional analysis reflecting "mental impressions, conclusions, opinions, or legal theories" of counsel to be protected pursuant to Rule 26(b)(3)(B). To the extent that the process of memorializing portions of the interview shows selectivity or strategy, it shows no more than is conveyed in the Crowl Report.[6]

The waiver resulting from production of the Crowl Report is limited by Federal Rule of Evidence 502. In ordering the production of the Tanagho Memorandum and redaction 13, the court is finding a general waiver of attorney-client privilege for communications with Mr. Crowl or Ms. Kelly, or a general waiver of protection for their work product. Redactions 6, 7(a), 15, 18 and 20(a) do not relate to the same subject matter as the Crowl Report, and neither do redactions 2, 3, 7(b), 11(b), 12(b), 16 and 20(b). Defendants' disclosure of the Report, therefore, does not waive the privilege applicable to those items, and they need not be produced.

Lerman's request for a finding of waiver of attorney-client privilege and work-product protection as applied to questions that may be asked of Mr. DeSalle at his deposition is denied. The claim of privilege must be made and supported on a question-by-question or document-by-document basis, so no such advance ruling will be rendered. *See Lawless*, 709 F.2d at 487. Counsel for the parties should, however, be guided by the rulings in this opinion.

---

[6] Defendants do not claim work-product protection as to redaction 13.

18

**CONCLUSION**

Accordingly, Plaintiff's Motion to Compel [dkt 32] is granted in part and denied in part without prejudice as set out above. The Tanagho Memorandum and the previously-redacted portions of the DeSalle Timeline that are ordered to be produced shall be produced to Lerman's counsel within three business days of this order.

IT IS SO ORDERED.

_____
Geraldine Soat Brown
United States Magistrate Judge

DATED: January 5, 2011

**Appendix**

| Redaction No. | Page | Location | Defendants' Description and Asserted Basis for Withholding | Ruling |
|---|---|---|---|---|
| 1 | CCC001297 | Top of page | Handwritten note from M. DeSalle to Assistant General Counsel, Paul A. Denham. 7/8/10. Attorney-Client Privilege. | Not protected. |
| 2 | CCC001297 | Right of 9/2 entry | Handwritten note from General Counsel, Annice M. Kelly. Work-Product Doctrine. | Protected; not waived. |
| 3 | CCC001297 | Right of 9/30 entry | Handwritten note from General Counsel, Annice M. Kelly to outside Counsel, Tom H. Luetkemeyer. Work-Product Doctrine and Attorney-Client Privilege. | Protected; not waived. |
| 4(a)<br><br>4(b)<br><br>4(c) | CCC001297 | 10/8 entry<br><br>First 10/9 entry<br><br>Second 10/9 entry | Notes regarding 10/8/09 and 10/9/09 communication between M. DeSalle and General Counsel, Annice M. Kelly. Attorney-Client Privilege. | 4(a): Not protected.<br><br>4(b): Not protected.<br><br>4(c): Not protected. |
| 5 | CCC001298 | Top of page | Handwritten note from M. DeSalle to Assistant General Counsel, Paul A. Denham. 7/8/10. Attorney-Client Privilege. | Not protected. |
| 6 | CCC001298 | 10/14 entry | Notes regarding 10/14/09 communication between M. DeSalle and General Counsel, Annice M. Kelly, regarding external audit. Attorney-Client Privilege. | Protected; not waived. |

| Redaction No. | Page | Location | Defendants' Description and Asserted Basis for Withholding | Ruling |
|---|---|---|---|---|
| 7(a)<br><br>7(b) | CCC001298 | 10/16 entry<br><br>Right of 10/16 entry | Notes regarding 10/16/09 meeting between M. DeSalle, General Counsel, Annice M. Kelly, Dr. Carter, and Provost Kapelke regarding Dr. Lerman's termination and surrounding issues. Attorney-Client Privilege. Redaction on far right is of a handwritten note by General Counsel, Annice M. Kelly. Work-Product Doctrine. | 7(a): Protected; not waived.<br><br><br>7(b): Protected; not waived. |
| 8 | CCC001298 | First 10/19 entry | Notes regarding 10/19/09 meeting between M. DeSalle and Dr. Carter regarding legal strategy. Work-Product Doctrine. | Not protected. |
| 9 | CCC001298 | Second 10/19 entry | Notes regarding 10/19/09 communication between M. DeSalle and General Counsel, Annice M. Kelly regarding legal strategy. Attorney-Client Privilege. | Not protected. |
| 10 | CCC001299 | Top of page | Handwritten note from M. DeSalle to Assistant General Counsel, Paul A. Denham. 7/8/10. Attorney-Client Privilege. | Not protected. |
| 11(a) | CCC001299 | 10/19 entry | Notes regarding 10/19/09 communication between M. DeSalle and General Counsel, Annice M. Kelly, regarding legal strategy. Attorney-Client Privilege | Not protected. |
| 11(b) | CCC001299 | Right of 10/19 entry | [Handwritten note on margin - not separately described in log.] | Protected; not waived. |

| Redaction No. | Page | Location | Defendants' Description and Asserted Basis for Withholding | Ruling |
|---|---|---|---|---|
| 12(a)<br><br>12(b) | CCC001299 | 10/20 entry<br><br>Right of 10/20 entry | Notes regarding 10/20/09 communication between Dr. Carter and General Counsel, Annice M. Kelly, and communication between M. DeSalle, Dr. Carter and E. Winston regarding legal strategy. Attorney-Client Privilege and Work-Product Doctrine. Redaction on far right is of a handwritten note by General Counsel, Annice M. Kelly. Work-Product Doctrine. | 12(a): Not protected.<br><br>12(b): Protected; not waived. |
| 13 | CCC001299 | 10/22 entry | Notes regarding 10/22/09 meeting between M. DeSalle, K. Doherty and Outside Counsel, Matthew Crowl and John Tanagho. Attorney-Client Privilege. | Protection waived. |
| 14 | CCC001300 | Top of page | Handwritten note from M. DeSalle to Assistant General Counsel, Paul A. Denham. 7/8/10. Attorney-Client Privilege. | Not protected. |
| 15 | CCC001300 | First 11/4 entry | Notes regarding 11/4/09 communication between M. DeSalle and Outside Counsel at Schiff Hardin LLP, regarding legal strategy. Attorney-Client Privilege. | Protected; not waived. |
| 16 | CCC001300 | Right of third 11/4 entry | Handwritten note from General Counsel, Annice M. Kelly. Work-Product Doctrine. | Protected; not waived. |

| Redaction No. | Page | Location | Defendants' Description and Asserted Basis for Withholding | Ruling |
|---|---|---|---|---|
| 17 | CCC001301 | Right of first 11/17 entry | Handwritten note from M. DeSalle to Assistant General Counsel, Paul A. Denham. 7/8/10. Attorney-Client Privilege. | Not protected. |
| 18 | CCC001301 | 11/20 entry | Notes regarding 11/20/09 communication between M. DeSalle, Dr. Carter and Provost Kapelke regarding the advice of legal counsel. Attorney-Client Privilege and Work-Product Doctrine. | Protected; not waived. |
| 19 | CCC001302 | Right of 12/7 entry | Handwritten note from M. DeSalle to Assistant General Counsel, Paul A. Denham. 7/8/10. Attorney-Client Privilege. | Not protected. |
| 20(a) | CCC001302 | 1/12 entry | Notes regarding 1/12/10 communication between M. DeSalle and K. Doherty regarding advice of counsel. Attorney-Client Privilege and Work-Product Doctrine. | Protected; not waived. |
| 20(b) | CCC001302 | Right of 1/12 entry | [Handwritten note on margin - not separately noted on log.] | Protected; not waived. |
| 21 | CCC001302 | 2/17 entry | Notes regarding 2/17/10 communication between M. DeSalle and Dr. Carter regarding legal strategy. Work-Product Doctrine. | Not protected. |