**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ZAFRA LERMAN, Ph.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10-CV-2169** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **ALLEN M. TURNER, WARRICK L.** | ) | |
| **CARTER, Ph.D., STEVEN KAPELKE,** | ) | |
| **Ph.D., ANNICE KELLY, and COLUMBIA** | ) | |
| **COLLEGE CHICAGO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION AND ORDER**

Plaintiff, Zafra Lerman, Ph.D., filed this lawsuit against Columbia College of Chicago ("Columbia"), Allen M. Turner, Warrick L. Carter, Ph.D., Steven Kapelke, Ph.D., and Annice Kelly, alleging gender, religious, and national origin discrimination, unlawful retaliation, retaliatory discharge, defamation, breach of contract, and invasion of privacy.[1] Columbia filed a counterclaim against Lerman, alleging breach of fiduciary duty, fraud, and conversion. Before the court are defendants' motions for summary judgment [#161, 164] on all of Lerman's claims and Lerman's motion for summary judgment [#166] on Columbia's counterclaims. For the following reasons, defendants' motions are granted in part and denied in part and Lerman's motion is denied.

---

[1] The court has jurisdiction over Lerman's federal claims under 42 U.S.C. § 1981, 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. § 1331 and supplemental jurisdiction over her state law claims under 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND[2]

Lerman, an Israeli-born Jewish female,[3] joined Columbia in 1977 as its first science faculty member. She achieved tenure upon Columbia's institution of a tenure track. In 1991, Lerman founded the Science Institute and thereafter served as its head. In that role, she was the direct supervisor of all employees working at the Science Institute. In addition to her teaching duties, Lerman helped establish the Malta Conference, a conference for scientists from the Middle East. Although not a Columbia program, Columbia faculty and staff occasionally donated to the Malta Conference.

## I.     The No Child Left Behind Grant

In 2006, Columbia received a No Child Left Behind grant (the "NCLB grant") through the Illinois Board of Higher Education ("IBHE") to assist teachers and students affiliated with the Chicago Public Schools. The NCLB grant was for fiscal year 2006, with all grant activities to be concluded by September 30, 2007. If grant funds were not used by that date and an extension was not obtained, the unused grant funds were to be returned to the IBHE. The NCLB grant funds were available to compensate employees and other individuals who worked on the grant. Lerman was the principal investigator for work performed on this grant and was responsible for administering the grant funds.

---

[2] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1. They are taken in the light most favorable to the non-movant. In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to the resolution of this motion.

[3] Although the parties have not included that Lerman is an Israeli-born Jew in their statements of fact, Lerman testified to this in her deposition, Lerman Dep. 55:22–56:12, and defendants proceed on summary judgment as if this is an established fact.

2

In July 2007, a group of five visiting professors performed work through the Science Institute's outreach program for the Chicago Public Schools. Lerman testified that she had designated a portion of the NCLB grant funds as honoraria for these five visiting professors and that they had agreed to donate those funds to the Malta Conference. Regardless of whether this was the case, no funds from the NCLB grant were ever paid to the five visiting professors. Instead, in September 2007, Lerman and Jeffrey Wade, her assistant, attempted to transfer money remaining in the NCLB grant account to the Malta Conference account at Columbia. Although Wade testified that such direct transfers had previously occurred, on this occasion, Columbia's accounting department denied the transfer request.

Thereafter, Lerman sought to find another way to transfer the remaining NCLB grant money to the Malta Conference. She consulted with Michael DeSalle, Columbia's Chief Financial Officer at the time, and together they developed what the parties term the "solution."[4] The solution was to pay Science Institute employees who had performed work under the NCLB grant the remaining funds who could then choose to donate the money to the Malta Conference. The solution was viable, however, only if the employees voluntarily chose to donate the money. Lerman represented to DeSalle that the employees she planned to pay did in fact have such donative intent. But Lerman admits that the employees had no choice to keep the money, for she would not have authorized payment to them unless they agreed to donate it to the Malta

---

[4] The parties dispute whether Kapelke, then Columbia's Provost and Senior Vice President, was involved in discussions in September 2007 regarding the solution. Lerman testified that she went to both Kapelke and DeSalle with the problem and that DeSalle came up with the solution. DeSalle testified that he did not recall whether Kapelke was involved but that it would not be unusual for Lerman to have consulted with Kapelke in such situations. Kapelke testified that he did not recall any conversation in September 2007 with Lerman or DeSalle regarding the NCLB grant and the solution. He also testified that he was not aware at the time of Lerman's termination that DeSalle was involved in the solution.

Conference.

Lerman thereafter authorized payment of the remaining NCLB grant funds to five employees, including herself. Lerman, Greg Neul, and David Morton received $6,185 each from the NCLB grant account. Ken Ilio and Mary Nalbandian received $6,220 each. The check requests for the payments to Ilio and Nalbandian indicated that, in addition to Dr. Linda Kimmel, Ilio and Nalbandian had been outside evaluators for the NCLB project.[5] All five employees donated the net amount they received to the Malta Conference.

## II.    2009 Investigations Involving Lerman and the Science Institute

In the summer of 2009, Lerman came into conflict with Science Institute employee Ken Ilio. On July 2, 2009, Ilio, along with two other Science Institute employees, Marija Kovacevic and Victoria Liu, complained about Lerman to Patricia Olalde, Columbia's Human Resources Director. Ilio then met with Ellen Krutz, Columbia's Vice President of Human Resources, on July 6, 2009. He also presented Krutz with a written statement summarizing Lerman's "abusive conduct." Defs.' L.R. 56.1 Ex. 15 at 1.[6] In addition to discussing his work environment, Ilio complained about how he received grant funds in September 2007 that he was required to donate to the Malta Conference. He wrote that he "felt very uncomfortable" but "had no choice but to do this." Defs.' L.R. 56.1 Ex. 15 at 7–8. Ilio repeated his complaint about the grant funds in his

---

[5] Kimmel prepared an external evaluation report dated September 24, 2007 with no assistance from either Ilio or Nalbandian. Lerman testified, however, that Nalbandian helped develop tests used in evaluating performance and performed these evaluations as well. She also testified that Ilio performed services as an outside evaluator.

[6] Exhibits attached to defendants' Local Rule 56.1 Statement of Material Facts (Dkt. No. 163) will be referred to as "Defs.' L.R. 56.1 Ex. __." Exhibits attached to Lerman's Local Rule 56.1 Statement of Material Facts (Dkt. No. 168) will be referred to as "Pl.'s L.R. 56.1 Ex. __." Exhibits attached to Lerman's Local Rule 56.1(b)(3) Response to Defendants' Statement of Material Facts and Statement of Additional Facts (Dkt. No. 176) will be referred to as "Pl.'s L.R. 56.1 Resp. Ex. __."

meeting with Krutz.

Ilio was not the only one to bring issues at the Science Institute to the administration's attention. After Ilio requested and was granted medical leave in early July 2009, Lerman complained about Ilio to Krutz and Kapelke in early July 2009. For example, on July 9, 2009, she sent Krutz and Kapelke an email complaining about Ilio's general performance and his failure to adhere to laboratory safety requirements. On this and other occasions, Lerman complained that, with Ilio absent but still receiving a salary, the Science Institute was overextended.

On August 25, 2009, Krutz and Olalde met with Lerman to discuss issues that both Lerman and Ilio had raised. Lerman has denied that her discussion of Ilio's work during this meeting related to the NCLB grant, instead testifying that she understood the meeting was to cover her allegations that Ilio had not conducted work under National Institute of Health ("NIH") and National Science Foundation ("NSF") grants, not the NCLB grant. But Krutz's takeaway from the meeting was that Ilio did not work on the NCLB grant and that Lerman acknowledged this fact. Olalde's notes state that Lerman explained that Ilio "had not done anything related to the [NCLB] grant but did make an effort to assist with" it. Defs.' L.R. 56.1 Ex. 17 at 2. Olalde further recorded that, instead of sending money back, Lerman decided "to use the money to give stipends and then the group decided to donate the funds to the Malta Fund so that the funds would go back to Columbia." *Id.* Krutz's notes reflect that Lerman alluded to the solution although did not identify with whom she discussed the issue. *See* Defs.' L.R. 56.1 Ex. 18 ("Because she could spend the grant $ to pay people (albeit for work done on the grant), she decided to authorize stipends to employees of [the Science Institute] for work they did not do

and then have them donate the net amount (after taxes) the Malta Conference.").

On August 26, 2009, Krutz reported to Kapelke on her meeting with Lerman. She informed Kapelke that Lerman acknowledged that she authorized stipends in fall 2007 from unused grant funds to Science Institute employees for work they had not done and then pressured those employees to donate the stipends to the Malta Conference. Kapelke memorialized the conversation and set forth next steps, which included notifying Carter, Columbia's President, and Kelly, Columbia's General Counsel; identifying the grant from which monies were paid and to whom; and determining whether those monies were then donated to the Malta Conference. Kapelke and Krutz agreed to "'contain' the investigation as best" they could. Defs.' L.R. 56.1 Ex. 19 at 2. That same day, John Wilkin, Columbia's Assistant Vice President of Budget Management and Academic Affairs, informed Kapelke and Krutz that Lerman, Nuel, Morton, Nalbandian, and Ilio had received payments from the NCLB grant account and soon thereafter made a donation to the Malta Conference in similar amounts.

Kapelke then met with Lerman on September 2, 2009. Lerman told Kapelke that Ilio had not been performing any research. She also told Kapelke that the money donated by Ilio to the Malta Conference had not been his to keep. Meanwhile, in mid-September 2009, Kelly engaged Matthew Crowl, a former Assistant United States Attorney and a partner at Schiff Hardin LLP, to conduct a further investigation into the allegations surrounding the NCLB grant and the ensuing donations to the Malta Conference. Crowl focused his investigation on whether grant money had been paid to individuals solely for the purpose of directing it to the Malta Conference. On October 1 and 2, Crowl met with Krutz, Lerman, Morton, Nalbandian, Olalde,

Wade, and Cynthia Thomas, Columbia's Director of Foundation and Government Grants.[7] Nalbandian reported that she was uneasy accepting the payment because it was for work she had not performed. Morton acknowledged that he would not have received any payment from the NCLB grant funds unless he donated those funds to the Malta Conference.[8] Crowl reported on his first interviews to Kapelke, Kelly, Carter, and Turner on October 1. Turner testified that, after discussing the investigation thus far, the decision was made to terminate Lerman's employment unless new evidence came to light when Crowl interviewed Lerman.

Crowl and Kelly then met with Lerman on October 2. Lerman testified that during this meeting she never discussed the fact that Ilio did not perform work on the NCLB grant but rather only spoke about how he had not performed any work under the NIH/NSF grants. Crowl's notes reflect that Lerman also spoke about how Ilio did no work under the NCLB grant. Lerman did tell Crowl that the visiting professors had indicated their desire to donate their honoraria to the Malta Conference and that this was the reason for the solution. Having decided that nothing Lerman said changed the conclusion that she should be terminated, at the end of this meeting, Crowl and Kelly informed Lerman that diversion of grant funds, as they believed had occurred with the NCLB grant, was grounds for termination. Lerman was given the option to resign or be fired. She was advised to consult with an attorney and report back on October 5.

---

[7] Krutz also met with DeSalle, but only on October 22, 2009.

[8] In his deposition, Morton testified that he did not feel uncomfortable receiving the NCLB grant funds and then donating them to the Malta Conference. He also stated that Lerman never told him that it was not a choice but something he must do. Finally, Morton testified that he performed work with teachers in the spring and summer of 2007.

After the October 1 and 2 interviews were complete,[9] Crowl and Kelly again met with Kapelke, Carter, and Turner.  Crowl expressed his belief that Lerman had committed fraud with respect to the NCLB grant funds.  Specifically, he concluded that Lerman wanted to use the NCLB grant funds instead of return them and so paid Columbia employees for work that they had not performed on the grant.  He also concluded that Morton, Ilio, and Nalbandian would not have received those payments if not for agreeing to Lerman's direction that the money be donated to the Malta Conference.  On November 20, 2009, Columbia returned $30,995 to the IBHE, the total amount of payments made to Lerman, Ilio, Morton, Nalbandian, and Nuel.

Although Columbia maintains that the termination decision was made only after Crowl began his investigation, DeSalle testified that it was announced by Carter and Kapelke at a September 30 cabinet meeting.  DeSalle testified that no reason was given but that those in attendance were instructed not to comment on the termination.  Carter testified that no decision had been made as of September 30 and that he did not recall that Lerman's employment status or the investigation were discussed during that cabinet meeting.

## III.    Lerman's Termination and the ERC Review

On October 5, 2009, Kapelke sent Lerman a letter indicating both that she was "terminated effective immediately" and "suspended without pay pending any review [she] may wish to seek."  Defs.' L.R. 56.1 Ex. 42.  Kapelke stated that the reasons for her termination were found in Section IX A, 2, 4, and 7 of the Statement of Policy on Academic Freedom, Faculty Status, Tenure, and Due Process ("Statement of Policy").  Because her "continued participation

---

[9] Crowl also interviewed Wade, although after having given Lerman the option of resigning or being fired.

8

in the affairs of the College [was] likely to be detrimental and/or disruptive to the College," she was "not permitted to be on campus except to the extent it [was] necessary to attend any review hearing." *Id.*

Pursuant to the Statement of Policy, on October 19, 2009, Lerman sought review of her termination by the Elected Representatives of the College ("ERC"). The ERC was thereafter convened and met with Lerman and other witnesses. Three witnesses from Columbia's administration who Lerman claims could have testified to the solution were prevented from testifying by the administration. The administration instead submitted information related to its investigation and provided a written response to the ERC's written questions.

The ERC issued a report on December 21, 2009. It initially pointed out that "it is outside of our purview to consider, pass on, or comment concerning the merits or substantive justification for the dismissal of Dr. Lerman." Defs.' L.R. 56.1 Ex. 45 at 3. Nonetheless, the ERC noted that its efforts had been "impeded by a lack of specificity in the reasons offered by the College for Dr. Lerman's termination." *Id.* at 3–4. Columbia was found to have deviated from the Statement of Policy in not formally presenting a written statement setting forth the reasons why Lerman's dismissal was appropriate, with the ERC rejecting Columbia's argument that setting forth the sections in the Statement of Policy that provided cause for termination was sufficient. The ERC acknowledged, however, that Lerman received the unredacted investigation file on October 16, 2009, even though Columbia was not required to provide Lerman with the results of its investigation. Because the ERC could not "verify facts as presented by Dr. Lerman or the College," it did not "determine whether decisions were made by the College based on material, prejudicial mistakes of fact." *Id.* at 5. The ERC recommended that Lerman be

provided with a written statement of reasons for her termination and that Columbia "consider Dr. Lerman's long and distinguished career and service to the College in its final determination with regard to employment and benefits." *Id.*

After reviewing the ERC report, Carter sent Lerman a letter on February 4, 2010 indicating that he disagreed with the ERC's conclusion that Lerman did not receive specifics regarding the reason for her termination. Carter went on to "state in writing that [Lerman was] terminated for misappropriating government grant funds." Defs.' L.R. 56.1 Ex. 46. Carter concluded by upholding Kapelke's decision to terminate Lerman, which was effective immediately.

## IV.    Carter's Statements About Lerman's Termination

After Lerman was suspended without pay in October 2009 and while the ERC review was pending, Carter spoke to representatives from the offices of U.S. Congresswoman Jan Schakowsky and U.S. Senator Richard Durbin regarding grants Columbia was seeking. In response to inquiries from both offices about Lerman, Carter responded that Lerman was no longer employed by Columbia and had been terminated for use of grant funds for a non-permitted purpose.

## V.     Evidence of Discriminatory Intent

In the summer of 2009, DeSalle testified that Turner approached him about closing the Science Institute and firing Lerman. DeSalle stated that he informed Turner that the Science Institute could be closed but that Columbia was required to retain and relocate Lerman based on the Statement of Policy and her tenured position. At that time, DeSalle claims that Turner made "disparaging remarks" regarding Lerman and her national origin. Pl.'s L.R. 56.1 Resp. Ex. EE

10

¶ 2. Lerman admits that Turner, who himself is Jewish, never made any derogatory comments to her regarding her religion, national origin, or ethnicity.

Lerman also complains that Kapelke scheduled provost forums and other Columbia events on Yom Kippur. As an example, she points to the following incident: On September 21, 2009, Ilio, through retained counsel, sent a letter to Columbia requesting the opportunity to review his personnel file pursuant to the Illinois Personnel Record Review Act, 820 Ill. Comp. Stat. 40/1 *et seq.* On September 23, Gerlyn Jackson, a Columbia employee, requested that Lerman provide all documents related to Ilio to her. On September 28, which was Yom Kippur, Deborah Coney, Kapelke's executive assistant, sent Wade a message indicating that Kapelke expected Ilio's personnel file to be sent to Human Resources that day. Despite knowing that Lerman was observing Yom Kippur, Wade contacted Lerman regarding the request. Lerman instructed Wade to contact Paul Denham, an assistant general counsel, who agreed that the file need not be transferred that day. Although Kapelke maintained his request was proper, he agreed to the delayed delivery while objecting to Wade's decision to involve Lerman on Yom Kippur.

## VI. Protected Activity

In January 2009, a Columbia faculty member of Palestinian descent, Suriya Smiley, was terminated. Lerman heard of the allegedly discriminatory firing when she attended a dinner for the Chicago chapter of the American-Arab Anti-Discrimination Committee. At that dinner, Columbia was identified as having discriminated against Smiley. Lerman then called Kapelke on May 13, 2009 to express support for Smiley. According to Lerman, Kapelke told her not to speak to anyone about the matter, singling out Jay Levine, a reporter who had been at the dinner.

11

## VII.  Comparators

Lerman has identified four Columbia employees who she claims were similarly situated to her but not members of a relevant protected class.

### A.  Ken Ilio

Ilio was a full-time Columbia employee although not a tenured faculty member.  He received a salary from unrestricted Columbia funds.  Ilio was not a principal investigator for any grant during the relevant time period, and the only grant funds he received during the relevant time period were from the NCLB grant.  Beginning July 2, 2009, Ilio took the full allotment of medical leave provided by the Family and Medical Leave Act.  His position was ultimately eliminated.

Lerman complained to Krutz, Olalde, and Kapelke in late August or September 2009 that Ilio had not performed any research under certain NIH and NSF grants.  Lerman also submitted a revised performance review for Ilio on August 24, 2009.  In it, she concluded that Ilio's performance was below expectations and accused Ilio of asking other department members whether he could put his name to their research.  She did not accuse him of committing fraud with respect to any NIH or NSF grants.  The August 2009 revised performance review was in contrast to prior performance reviews Lerman had given Ilio, including one in spring 2009, in which Ilio was said to meet or exceed expectations.

Kapelke met with Science Institute employees to investigate Ilio's performance, summarizing his findings in a November 8, 2009 memorandum to Krutz.  Krutz also interviewed Ilio related to Lerman's allegations.  In a November 20, 2009 memorandum to Kapelke, Krutz concluded that "while Dr. Ilio may not have worked as hard as he could have, he did meet the

12

expectations that were communicated to him." Defs.' L.R. 56.1 Ex. 37 at 2. She also noted that

"Dr. Ilio requires more supervision than he has gotten in the past." *Id.* at 3. Krutz made the

following recommendations for when Ilio returned to the Science Institute:

1.  There are clear expectations about the kind of work he is expected to do, and what the outcomes of that work are.
2.  Roles, responsibilities, and duties among the Science Institute staff need to be clarified.
3.  Regular follow-up on Dr. Ilio's progress toward completing goals should be done by his supervisor.
4.  Regular and clear feedback about the quality and quantity of Dr. Ilio's work needs to be given to Dr. Ilio.

*Id.* Carter, Kelly, and Turner were not involved in deciding how or whether to discipline Ilio.

**B.  David Flatley**

David Flatley was a non-tenured Columbia employee who requested that a vendor

invoice Columbia for materials the vendor had not yet delivered so that the invoice could be paid

during a budget period. An internal audit of these invoices was conducted. When asked about

the pre-invoicing, Flatley stated to the internal auditor that "he was unaware that pre-invoices

could not be submitted for projects that were still in process and not yet completed." Pl.'s L.R.

56.1 Resp. Ex. S at 3. The internal auditor reported that pre-invoicing should not be done but

that a department head or chair could request through the Vice President for Business Affairs

that budget funds be transferred to the next fiscal year if a specific project could not be

completed within that budget year. Flatley was reprimanded for his actions but not discharged.

The internal audit report was distributed to Carter, Kapelke, and Turner. Kelly was not involved

### C. Doug Jones

Doug Jones was a tenured professor and chair of the Columbia Audio Arts and Acoustics Department. At some point between 2006 and 2009, Jones was accused of selling college-owned musical equipment without authorization. An investigation into the accusation performed by Columbia's internal auditor concluded that he was not selling college equipment and pocketing the money but rather was selling his own personal equipment. Jones was never suspended.

### D. Kevin Fuller

Kevin Fuller was a Columbia faculty member until Columbia learned of his arrest on child pornography charges. At that time, Fuller was suspended without pay before his ultimate termination.

## VIII. MIMSAD

In 1994, the fact that Lerman was receiving a higher salary than many other Columbia faculty members was revealed in Columbia's tax filings and published in the Columbia school newspaper. This brought unwanted attention to Lerman and Columbia. Although Lerman's higher salary was due in part to grant funds (which other faculty members did not have the benefit of), Lerman was concerned with how her compensation was perceived. Thus, Lerman brought the issue to Columbia's then-President, Dr. John Duff. Duff suggested that Lerman's salary could be separated out between Columbia private funds and the public grant funding. Lerman thereafter created MIMSAD, Inc. ("MIMSAD"), a private corporation through which she was to receive payment for grant work. MIMSAD's given address was the same as Lerman's.

14

Since MIMSAD's incorporation, Lerman continued to receive a salary from Columbia for work performed during the academic year, which ran from August 16 to May 31. Columbia also issued payments to MIMSAD at regular intervals.[10] Between June 15, 2004 and July 30, 2009, MIMSAD submitted sixteen invoices to Columbia totaling $156,079.90, which Columbia then paid.

In February 2001, Lerman received and acknowledged receiving Columbia's new conflict of interest policy. The conflict of interest policy requires employees to disclose a financial interest in, personal relationship with, or receipt of substantial consideration from an outside vendor providing services to Columbia. The policy does not provide whether the disclosure should (or could) be made verbally or in writing nor does it identify when such a disclosure must be made. It does, however, instruct that a memo should be prepared describing the conflict of interest and subsequent decisions. Lerman did not make any disclosures regarding MIMSAD pursuant to the conflict of interest policy.

Nonetheless, before the policy was instituted, several senior administrators at Columbia, aside from Duff, were aware of Lerman's connection to MIMSAD and the fact that Lerman was receiving grant payments in MIMSAD's name. These administrators include Bert Gall, Columbia's Executive Vice President and Provost from 1992 to 1997 and its Executive Vice President from 1997 to 2003; DeSalle, Columbia's Chief Financial Officer from 1989 to 2010; and Woodie White, Columbia's Vice President of Institutional Advancement from 1993 to 2003. White stated that it was "common knowledge among senior administration officials that Lerman was affiliated with MIMSAD and that MIMSAD regularly received payments from grant funds

_____

[10] Any payments for over $3,000 needed two signatures.

15

for grants that Lerman procured, in addition to the salary that Lerman received from Columbia." Pl.'s L.R. 56.1 Ex. G ¶ 5. White includes Carter as one of the senior administration officials aware of the arrangement. Lerman also testified that she discussed MIMSAD with Carter in 2000, when he assumed Columbia's presidency. Carter, however, has denied any knowledge of MIMSAD and Lerman's relationship to it until after discovery began in this lawsuit.

Lerman's expert, Debbi Gilad, opined that the arrangement Lerman had with MIMSAD to reduce the amount of her salary reported on Columbia's IRS Form 990 was inappropriate and would not have been acceptable to a federal granting agency. She also stated that a seasoned grants management compliance professional would have known that the MIMSAD arrangement was inappropriate but acknowledged that Columbia did not have an adequate compliance program. Gilad also opined that faculty members in an academic institution do not keep a precise allocation of time and that evening and weekend work is part of their institutional salary. Grant money, according to Gilad, is generally intended to supplant an academic's salary, not supplement it.

Lerman was charged with deciding how the grant funds at issue were to be disbursed. She admitted that if she performed work under a grant during the day, payment for those services from grant funds should have been directed to her regular salary. But Lerman, supported by White, also testified that faculty members could be compensated extra from grant funds for additional work performed after hours, on weekends, and outside the academic year. Determining what work was performed when is complicated by the fact that Lerman did not keep any time records to establish when she was providing services during and after hours or

through MIMSAD.  She admits that she saw no difference between the work she performed as an

individual and the work she performed through MIMSAD.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee notes (1963 amend.). While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## ANALYSIS

### I.    Defendants' Motions for Summary Judgment

#### A.    Discrimination Claims

Lerman alleges that Columbia unlawfully discriminated against her on the basis of her gender, religion, and/or national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* Lerman also claims that all defendants discriminated against her based on her Jewish ancestry and ethnicity in violation of 42 U.S.C. § 1981. The method of proving discrimination under Title VII and § 1981 is "essentially identical" and thus the same analysis applies to Lerman's claims under both statutes. *See McGowan* v. *Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009).

Lerman proceeds under the familiar indirect method of proof set out in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under this approach, to demonstrate a *prima facie* case of discrimination, Lerman must show that (1) she is a member of a protected class; (2) she was meeting Columbia's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *Naficy* v. *Ill. Dep't. of Human Servs.*, 697 F.3d 504, 511 (7th Cir. 2012). If Lerman establishes a *prima facie* case, Columbia must present evidence showing a legitimate, nondiscriminatory reason for the employment action. *Id*. Lerman must then present evidence showing that Columbia's stated reason is pretextual. *Id*. at 511–12.

Defendants argue that Lerman has failed to establish a *prima facie* case because she cannot show that she was meeting Columbia's legitimate expectations and she has failed to identify other similarly situated employees outside of her protected classes who were treated more favorably. Moreover, they argue that she cannot establish that Columbia's stated reason for termination—misuse of grant funds—was pretextual.

### 1. Legitimate Expectations

To establish her *prima facie* case, Lerman must show that she was meeting Columbia's legitimate expectations at the time of the discriminatory acts. *See Naik* v. *Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010). Columbia argues that Lerman was not meeting its legitimate expectations based on the results of its investigation into the NCLB grant fund transfer. Lerman contends that Columbia's decision to terminate her based on the NCLB grant fund investigation was illegitimate and unwarranted. Although the Seventh Circuit has cautioned that district courts need not reach the pretextual analysis without first determining

19

whether a plaintiff can make out a *prima facie* case, where "an employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the question whether the employer proffered a nonpretextual explanation for its challenged conduct." *Duncan* v. *Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008); *see also Keeton* v. *Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012). Accordingly, whether Lerman was meeting Columbia's employment expectations will be discussed in connection with the pretext analysis below (Part I.A.3).

## 2. Similarly Situated Employees

To make out her *prima facie* case, Lerman must identify similarly situated employees outside of her protected classes who were treated more favorably. The similarly situated employee inquiry, which calls for a "flexible, common sense" approach, asks whether there are "enough common features between the individuals to allow [for] a meaningful comparison." *Argyropoulos* v. *City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008). While "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations," *Naik*, 627 F.3d at 600 (internal quotation marks omitted), they need not be "identical in every conceivable way," *Coleman* v. *Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). In order to show that an employee was similarly situated, Lerman must demonstrate that he or she "(1) dealt with the same supervisor, (2) [was] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his or her] conduct or the employer's treatment of [him or her]." *Id*. at 847 (internal quotation marks omitted).

Lerman proffers four potential comparators: Flatley, Fuller, Ilio, and Jones. Initially, Fuller is not a valid comparator. Although Lerman claims in a footnote that he was not locked out of his office or fired for misconduct from the time he was accused and convicted, the only evidence properly presented to this court by the parties in their Local Rule 56.1 statements is that Fuller was suspended without pay upon his arrest on child pornography charges and thereafter terminated. This is the same adverse action to which Lerman was subjected.

Nor is Jones similarly situated to Lerman. Jones, although holding a comparable position to Lerman's as a tenured professor and chair of the Columbia Audio Arts and Acoustics Department, did not engage in similar conduct. Columbia concluded that the accusation that he was selling college-owned equipment without authorization was unfounded, learning instead that Jones was merely selling his own personal equipment.[11] Without a comparable violation, Jones cannot be used as a comparator. *See Antonetti* v. *Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009) (employee who did not engage in conduct similar to plaintiff's could not be considered as a comparator).

---

[11] Lerman asserts that Jones violated federal grant rules by "(1) not disclosing his financial relationship with a third-party vendor that had a significant (approximately $10,500) financial transaction with Columbia, and (2) submitting expense reports and receiving reimbursement from Columbia for expenses incurred while representing that outside vendor at two separate conferences." Pl.'s L.R. 56.1 Stmt. of Additional Facts ¶ 32. But her only citation for this paragraph, the DeSalle deposition, does not support these allegations and so the court will not consider them. Lerman also attempts to rely on her own answers to interrogatories to demonstrate that Jones was punished less severely than she was, *id.* ¶ 33, but she has not provided "an admissible foundation from which to conclude" that her answers are based on personal knowledge. *See Luster* v. *Ill. Dep't of Corr.*, 652 F.3d 726, 731 & n.2 (7th Cir. 2011) ("[A] party cannot use his own interrogatory answer, which is almost certainly hearsay when offered by that party himself to prove the truth of its contents, to support or oppose summary judgment. Rule 56(c)(4) requires that affidavits and declarations to support or oppose summary judgment must be made on personal knowledge.").

Defendants argue that Flatley and Ilio also are not proper comparators because, unlike Lerman, they were not tenured members of the Columbia faculty. In *Keri* v. *Board of Trustees of Purdue University*, the Seventh Circuit differentiated between tenured and non-tenured faculty members, as the plaintiff, a non-tenured professor, "was subject to different standards than the tenured ones." 458 F.3d 620, 644–45 (7th Cir. 2006), *overruled on other grounds by Hill* v. *Tangherlini*, --- F.3d ----, 2013 WL 3942935 (7th Cir. Aug. 1, 2013). But *Keri* did not announce a rigid rule that, for all purposes, a non-tenured professor cannot be considered a comparator for a tenured professor. In *Keri*, as opposed to here, a non-tenured professor sought to use tenured professors as comparators. *Id.* But because tenured professors are subject to greater protection from termination and enjoy "greater freedom and economic security" than non-tenured professors, such a comparison is not appropriate but may, depending on the circumstances, be appropriate where the plaintiff is a tenured professor using non-tenured professors as comparators. *See Abuelyaman* v. *Ill. State Univ.*, 667 F.3d 800, 810–11 (7th Cir. 2011) (difference in evaluation standards for professors of different ranks meant tenured professors could not serve as comparators for non-tenured professor's claim); *Rodgers* v. *White*, 657 F.3d 511, 518 (7th Cir. 2011) ("Supervisors typically make unrealistic comparators because, as relevant to the issues in a particular case, employees of higher rank commonly have different job duties or performance standards."). Here, the differences with respect to discipline and termination for tenured and non-tenured faculty are not so significant (in fact, Lerman was subject to additional protection from termination under the Statement of Policy), and thus the differences in rank do not automatically rule out Flatley and Ilio as comparators. The relevant job performance issue, proper grant management, is the same for Lerman as for Flatley and Ilio.

Because the comparator analysis "is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees," the court will proceed to determine whether Flatley and Ilio engaged in similar conduct but were treated more favorably. *Humphries* v. *CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008); *see also Coleman*, 667 F.3d at 851 ("Where a proposed comparator violated the same rule as the plaintiff in an equivalent or more serious manner, courts should not demand strict factual parallels.").

Lerman argues that Ilio engaged in similar conduct because he was accused of performing no research under NIH and NSF grants but the only recommendations coming out of Columbia's investigation into Lerman's charges against Ilio were that expectations with respect to his work be clarified and that Ilio be subject to greater supervision. Although Ilio may not have done any work under the NIH or NSF grants, Lerman has not presented evidence outlining Ilio's role in connection with these grants or what work he was allegedly required to be performing under these grants. She has admitted, however, that he was not the primary investigator on any grant during the relevant time period. The records of Columbia's investigation, as well as Lerman's revised August 2009 performance review of Ilio, do not include any information regarding the NIH and NSF grants. Without more to suggest that Ilio was subject to the same standards as Lerman and engaged in similar conduct, the court cannot conclude that he is a proper comparator.

Flatley's conduct is sufficiently similar to that of Lerman's, however. Both were charged with administering the grant funds at issue. Both violated Columbia's policies with respect to the use of grant funds. Both were attempting to use funds that would have otherwise expired.

Both involved other employees in the process.[12]  Flatley and Lerman objectively "engaged in comparable rule or policy violations," *Naik*, 627 F.3d at 600, but Flatley was merely reprimanded while Lerman was terminated.  Even DeSalle, who was involved in the Flatley investigation, described Flatley's conduct constituted "fraud."  Defs.' L.R. 56.1 Ex. 40. Although the investigations into the two situations concluded that Flatley violated grant policies innocently while Lerman did so intentionally, Columbia's subjective motivations—its beliefs regarding what occurred in each of the two cases—are not relevant to Lerman's *prima facie* case but will be discussed in connection with the pretext inquiry.  *See Coleman*, 667 F.3d at 851 n.4 ("An employer's honest belief about its motives for disciplining a Title VII disparate treatment plaintiff is relevant, but at the pretext stage, not for the plaintiff's prima facie case.  The similarly-situated inquiry is about whether employees are *objectively* comparable, while the pretext inquiry hinges on the employer's *subjective* motivations.").[13]

### 3.    Pretext

The parties do not dispute that Columbia has set forth a legitimate, nondiscriminatory reason for terminating Lerman: that Lerman misused grant funds by compensating employees for work they did not perform on the NCLB grant with the expectation that the money be donated to the Malta Conference.  The burden then shifts back to Lerman to show that Columbia's stated reason was pretextual.

---

[12] Defendants argue that there is no indication that Flatley used other employees to accomplish the pre-invoicing, but the internal audit report indicates that Flatley "requested that another staff member contact the two outside vendors to obtain pre-invoices to process for payment before the product was completed and shipped."  Defs.' L.R. 56.1 Ex. 38 at 2.

[13] Defendants rely on *Taylor* v. *On Tap Unlimited, Inc.*, 282 F. App'x 801 (11th Cir. 2008), an unpublished Eleventh Circuit case not binding on this court.  *Taylor* addressed the similarly situated inquiry in conjunction with whether the plaintiff had established pretext.

To show pretext, Lerman must demonstrate that "'(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent.'" *Perez* v. *Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (quoting *E.E.O.C.* v. *Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006)). "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence.'" *Blise* v. *Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (brackets omitted) (quoting *Texas Dep't of Cmty. Affairs* v. *Burdine,* 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *See Duncan*, 518 F.3d at 492; *Stewart* v. *Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered."). Evidence that Columbia treated similarly situated employees differently is also relevant to the pretext analysis. *Coleman*, 667 F.3d at 857–58.

Defendants argue that Lerman cannot show pretext because the decisionmakers honestly believed that Lerman had engaged in the misuse of grant funds. Lerman responds that those involved in the investigation were aware of the solution and in fact that Kapelke was involved in the solution's formulation. As set forth above, *see supra* note 4, the parties dispute whether Kapelke was aware of or involved in the solution prior to 2009. Lerman did, however, inform Crowl and Kelly of the solution during their meeting on October 2, 2009. Whether defendants were aware of the solution at the time the decision was made to terminate Lerman is thus a disputed fact.

Defendants maintain that this disputed fact is immaterial, however, as, even armed with this knowledge, they still would have been justified in their belief that Lerman had misused grant funds. Lerman admits that the solution had two conditions: (1) that the employees have performed compensable work under the grant, and (2) that the donations to the Malta Conference be voluntary. Nalbandian admitted to Crowl that she did not perform any work on the grant. Defendants also understood Lerman to admit that Ilio did not work on the NCLB grant, an understanding supported by contemporaneous notes.[14] Lerman also acknowledged during the investigation that the employees would not have received any funds from the NCLB grant unless they agreed to donate them to the Malta Conference. Thus, even if defendants knew of the solution, Lerman has failed to raise a genuine issue as to defendants' belief that Lerman had not complied with the solution's conditions.[15]

This does not end the pretext inquiry, for the honesty of the stated reason for Lerman's termination is called into question by the different discipline Lerman and Flatley were subjected to for similar conduct. Defendants emphasize that this difference was warranted because the investigation into Flatley's conduct indicated that Flatley's violation of grant procedures was innocent. They argue that, by contrast, Lerman intentionally violated grant procedures. But this proffered rationale is not enough on summary judgment. *See Coleman*, 667 F.3d at 851

---

[14] Lerman's claim now that she was confused when discussing Ilio's involvement with defendants and Crowl is irrelevant. *See Kariotis* v. *Navistar Int'l Transp. Corp.*, 131 F.3d 672, 679 (7th Cir. 1997) ("What [plaintiff] meant to say is unimportant; at most she has proven that [the decisionmaker] misinterpreted her reference[.]").

[15] Although Lerman argues that a reasonable jury could find that she did not misuse grant funds because she complied with the solution, that is not the relevant inquiry. "That a jury might disagree with [the decisionmakers] or even find that they erred in their assessment does not render their termination decision discriminatory." *Everroad* v. *Scott Truck Sys., Inc.*, 604 F.3d 471, 478 n.2 (7th Cir. 2010).

(defendant could argue that employees were not appropriate comparators because defendant viewed their behavior as an "isolated instance where no particular threats were involved" while they considered plaintiff to have made a credible threat was "not a winner on summary judgment"). *But see Taylor* v. *On Tap Unlimited, Inc.*, 282 F. App'x 801 (11th Cir. 2008) (plaintiff could not show employer's proffered reason was pretextual based on similarly situated employee who employer determined had made a mistake in committing the misconduct at issue). In light of the dispute over defendants' awareness of the solution and whether Lerman understood her actions to be sanctioned by Columbia, the difference in the discipline Flatley and Lerman received supports denying summary judgment. *See Stalter* v. *Wal-Mart Stores, Inc.*, 195 F.3d 285, 290–91 (7th Cir. 1999) (employer's explanation that employee was fired for stealing chips could be pretextual where, under employee's version of events, the employer knew that person from whom chips were "stolen" had given implied permission to take them and punishment was severe in relation to offense and that received by others also accused of theft).

The sequence of events surrounding Lerman's termination is another bit of circumstantial evidence of pretext. DeSalle testified that Turner contacted him in the summer of 2009 regarding closing the Science Institute and firing Lerman, becoming "angry" with DeSalle for his response that tenured professors within the Science Institute must be relocated to another department. The subsequent investigation, although not initiated by Turner, suggests that the investigation was a convenient way of effectuating Turner's request. Although Columbia relies on Crowl's investigation to buttress its stated reason for termination, DeSalle testified that the decision to terminate Lerman was announced on September 30 during a cabinet meeting, before Crowl had begun any interviews, suggesting that the outcome was predetermined. Carter

disputed DeSalle's recollection, but this is a credibility battle not for the court to determine on summary judgment. *See Lawson* v. *Veruchi*, 637 F.3d 699, 705 (7th Cir. 2011) ("It is not for us (any more than it was for the district court), though, to judge the credibility of the competing versions—that is a question for the jury.").

Lerman also relies on DeSalle's testimony that her termination was unwarranted to demonstrate a dispute regarding pretext. Initially, DeSalle's personal opinion as to whether termination was warranted is not sufficient on its own to create a genuine issue of material fact. *See Collins* v. *Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (rejecting pretext argument, where plaintiff relied on only one piece of evidence, the fact that she disagreed with the employer's allegations during the investigation, noting that "merely denying the employer's allegations . . . is not enough to survive summary judgment under the indirect method."). Nevertheless, defendants made a seemingly conscious decision to limit the individuals involved in the investigation and only had Crowl interview DeSalle after the termination decision was made. Although "merely pointing to an employer's shoddy investigatory efforts," where there is other evidence of pretext, "the quality of [Columbia's] investigation may have some bearing on the truthfulness of [Columbia's] proffered reasons for terminating [Lerman]." *Humphries*, 474 F.3d at 407. DeSalle's non-involvement in the investigation coupled with his later statements that Lerman followed grant procedures to Crowl provide additional circumstantial evidence to support a reasonable inference that the reasons given for Lerman's termination were pretextual. *Id.*

Finally, Lerman relies on the ERC's conclusions to support a finding of pretext. While the ERC did not "consider, pass on, or comment concerning the merits or substantive

justification for the dismissal of Dr. Lerman," it did note "direct contradictions in the evidence [and] testimony of witnesses."  Defs.' L.R. 56.1 Ex. 45 at 3.  Further, when viewed in the light most favorable to Lerman, it can be inferred from the ERC report that the ERC believed termination was inappropriate for the accusations leveled against Lerman, for the ERC requested that Columbia "consider Dr. Lerman's long and distinguished career and service to the College in its final determination."  *Id.* at 5.  The ERC was admittedly not the decisionmaker, but its recommendations were considered by Carter before he ratified the termination decision.  Thus, this serves as additional circumstantial evidence of pretext.  Drawing all reasonable inferences in Lerman's favor, there remain disputed questions that warrant denying summary judgment on Lerman's discrimination claims.

### 4.      Individual Liability under § 1981

In order to proceed against the individual defendants on her § 1981 claims, Lerman must also show that the individual caused or participated in the discrimination and that the individual had an intent to discriminate on the basis of her national origin.  *Smith* v. *Bray*, 681 F.3d 888, 899 (7th Cir. 2012); *Behnia* v. *Shapiro*, 961 F. Supp. 1234, 1237 (N.D. Ill. 1997).  Carter, Kelly, and Turner argue that there is no evidence to hold them individually liable.

Initially, Lerman has presented no evidence that would raise a question as to whether Kelly held any discriminatory intent.  Lerman claims that Kelly continually called Lerman's office on Yom Kippur in 2009 demanding Ilio's personnel file, but the evidence she cites does not support this.  Even if someone from Columbia's Office of General Counsel called Lerman's office on Yom Kippur, this cannot serve to impute discriminatory intent to Kelly.  There is no evidence that calls were placed to Lerman's office that day at Kelly's direction.  Further, Wade,

29

Lerman's assistant, was ultimately told by someone else in the Office of General Counsel that the request need not be complied with that day. Nor can Lerman demonstrate that Kelly treated a similarly situated employee differently, for Lerman admits that Kelly was not involved in the investigation into Flatley's conduct. Thus, summary judgment will be granted in favor of Kelly on Lerman's § 1981 claim.

Lerman has, however, raised a question as to whether Turner can be held individually liable. She first relies on DeSalle's declaration that Turner made "disparaging remarks" about Lerman's national origin to him in the summer of 2009. On its own, without any indication of what the remarks were or how they were disparaging, this conclusional statement is not sufficient to raise a question of material fact. *See Montgomery* v. *Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) ("[M]ere conclusory allegations do not constitute evidence."). Lerman also testified that, based on her interactions with him, Turner had an anti-Israeli attitude, was demeaning to her on that basis, and was not supportive of her work with the Malta Conference. She further testified that Turner was responsible for removing courses from the Science Institute and Lerman's control. This testimony at least raises a question as to discriminatory intent. *See Hill*, 2013 WL 3942935, at *2 (self-serving testimony can be considered when based on personal knowledge). The fact that Turner himself is Jewish does not automatically suggest otherwise. *See Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." (quoting *Castaneda* v. *Partida*, 430 U.S. 482, 499, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977)). Additionally, there is a question as to Turner's involvement in the

Flatley investigation, for his name was listed on the audit report. Finally, there is evidence that Turner was present at the meetings on October 1 and 2, 2009 during which Lerman's termination was discussed. Although Turner may not have been the ultimate decisionmaker, Lerman has at least raised a question of whether the cat's paw theory of liability applies, "where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Smith*, 681 F.3d at 897, 899–900 (quoting *Alexander* v. *Wisconsin Dep't of Health & Family Servs.*, 263 F.3d 673, 684 (7th Cir. 2001)); *cf. Alexander*, 263 F.3d at 683 (affirming summary judgment for two defendants on § 1981 claim where plaintiff "provid[ed] no facts indicating that either [of the defendants] were involved in any capacity with the decision to suspend him.").

Carter admits that he was involved in Lerman's termination, but argues that there is no evidence that he acted with discriminatory intent. Lerman does not point to any direct evidence of Carter's discriminatory intent, instead relying on comparator evidence to show intent indirectly. As with Turner, Carter was listed on the audit report related to the Flatley investigation, suggesting that he may have had some involvement in the issue. Carter, however, has testified that he was unaware of the Flatley investigation until this litigation. Whether the audit report belies Carter's testimony is a question for the jury. Thus, Lerman's § 1981 claims may proceed against Carter and Turner.

### B.    Title VII Retaliation

Lerman also claims that Columbia retaliated against her in violation of Title VII by terminating her after she voiced support for a terminated Palestinian faculty member to Kapelke. Title VII prohibits an employer from retaliating against an employee who has opposed an unlawful employment practice.  42 U.S.C. § 2000e-3(a).  Lerman may proceed under either the direct or indirect method.  *Nichols* v. *S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007).  Lerman frames her argument under the direct method but could also proceed under the indirect method.[16]  As discussed above, Lerman has sufficiently raised a question as to pretext. Thus, the only issue remaining is whether Lerman engaged in statutorily protected activity.

Columbia argues that Lerman has failed to show any protected activity for "voicing general support for another employee's assertion of rights does not constitute protected activity." Dkt. No. 162 at 19.  But "an informal complaint may constitute protected activity for purposes of retaliation claims."  *Casna* v. *City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009).  Columbia's citation to *Tomanovich* v. *City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006), does not support a different conclusion.  *Tomanovich* recognized that general complaints of discrimination or harassment are insufficient to constitute protected activity where those

---

[16] Under the indirect method, the elements are the same as for Lerman's discrimination claims, except instead of showing she is a member of a protected class she must show that she engaged in protected activity.  *See Hobgood* v. *Ill. Gaming Bd.*, --- F.3d ----, 2013 WL 3599498, at *5 (7th Cir. July 16, 2013).  Under the direct method, Lerman must show (1) that she engaged in protected activity, (2) that she was subjected to an adverse employment action, and (3) a causal link between the protected activity and the employment action.  *Id.* at *6.  A causal link may be shown through direct evidence or "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Silverman* v. *Bd. of Educ. of the City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011) (citations omitted).  "The convincing mosaic of circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination."  *Pagel* v. *TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012).

complaints do not "indicat[e] a connection to a protected class or provid[e] facts sufficient to create that inference." *Id.* Here, however, there is no claim that Lerman did not draw attention to the fact that Smiley was Palestinian or that the alleged discrimination was based on anti-Arab sentiment. Columbia also cites to *Schramm* v. *Slater*, 105 F. App'x 34, 42 (6th Cir. 2004), for the proposition that voicing general support for another employee's assertion of rights is not protected activity. But in *Schramm*, the court found the plaintiff had not engaged in protected activity in opposing another employee's protected activity. Lerman, on the other hand, was protesting perceived discrimination that violated Title VII. Thus, there is sufficient evidence to find that Lerman engaged in protected activity and summary judgment will be denied on the Title VII retaliation claim.

### C. Common Law Retaliatory Discharge

Common law retaliatory discharge claims generally arise when an employee is terminated for (1) filing a worker's compensation claim or (2) reporting illegal or improper conduct. *Mackie* v. *Vaughan Chapter–Paralyzed Veterans of Am., Inc.*, 820 N.E.2d 1042, 1044–45, 354 Ill. App. 3d 731, 289 Ill. Dec. 967 (2004). In order to state a claim for retaliatory discharge under Illinois law, Lerman must show that (1) she was discharged, (2) the discharge was in retaliation for her activities, and (3) the discharge violates a clear mandate of public policy. *Belline* v. *K-Mart Corp.*, 940 F.2d 184, 186 (7th Cir. 1991). Here, Lerman claims that she was terminated in retaliation for complaining of Ilio's alleged abuse of NIH/NSF grant funds. Illinois public policy favors the reporting of crimes to employers and protects employees who do so in the workplace from termination as a result. *See id.* at 187 ("The great majority of courts interpreting Illinois law hold that an employee who reports unlawful conduct to an

employer is protected under the tort of retaliatory discharge."); *Shearrow* v. *Easton Enters., LLC*, 895 F. Supp. 2d 882, 888 (N.D. Ill. 2012) ("One clearly mandated public policy is that crime should not go unreported and employees acting in good faith should not be deterred from reporting by a fear of retaliatory discharge.").

Lerman must also demonstrate causation, however, an element which "is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Hartlein* v. *Ill. Power Co.*, 601 N.E.2d 720, 728, 151 Ill. 2d 142, 176 Ill. Dec. 22 (1992). But merely calling into question Columbia's stated basis for terminating Lerman is not sufficient to survive summary judgment on Lerman's common law retaliatory discharge claim. *See Gacek* v. *Am. Airlines, Inc.*, 614 F.3d 298, 303 (7th Cir. 2010); *Reid* v. *Neighborhood Assistance Corp. of Am.*, No. 11 C 8683, 2013 WL 1087557, at *10 (N.D. Ill. Mar. 14, 2013). "[T]he ultimate issue to be decided is the employer's motive in discharging the employee," which may be established through circumstantial evidence. *Zuccolo* v. *Hannah Marine Corp.*, 900 N.E.2d 353, 359–60, 387 Ill. App. 3d 561, 326 Ill. Dec. 717 (2008). Approximately a month elapsed between Lerman's complaints regarding Ilio's misuse of grant funds and her termination. *See Hugo* v. *Tomaszewksi*, 508 N.E.2d 1139, 1141, 155 Ill. App. 3d 906, 108 Ill. Dec. 562 (1987) ("[T]he timing of the discharge in relation to other events will virtually always be a critical circumstance."). Although suspicious timing is not typically sufficient to support an inference of causation, *see Reid*, 2013 WL 1087557, at *12, when combined with the questions surrounding Lerman's termination as discussed in connection with her discrimination claims, there is a material dispute as to whether Lerman's reciprocal complaints about Ilio's misuse of grant funds were the cause of her termination. *See Zuccolo*, 900 N.E.2d at 359 ("The issue of an employer's

34

true motive in terminating an employee is a question of fact, not normally subject to summary judgment."). Therefore, summary judgment on Lerman's retaliatory discharge claim will be denied.

### D.      Breach of Contract

Lerman also claims that Columbia breached the Statement of Policy by (1) not providing her with a written statement setting forth the nature of the cause for termination and the reasons dismissal is appropriate, (2) making no effort to correct the alleged conduct by less severe action than termination, and (3) refusing to allow oral testimony before the ERC by Columbia administrators who could have testified about the solution. As to the first claimed breach, the ERC found that "there was a procedural deviation by the College because the reasons for Dr. Lerman's termination were not and have not been formally presented" and recommended that Columbia provide her with such reasons. Defs.' L.R. 56.1 Ex. 45 at 3. Carter's February 4, 2010 letter to Lerman thereafter formally provided her with the reason for dismissal, "stat[ing] in writing that [Lerman was] terminated for misappropriating government grant funds." Defs. L.R. 56.1 Ex. 46. Thus, this alleged breach is not actionable.

As to the second claimed breach, Columbia admits that it did not attempt to correct the alleged conduct by imposing a less severe sanction but argues that it was not required to do so. The Statement of Policy provides that "[p]rior to dismissing [a tenured] faculty member, the College will, in ordinary circumstances, attempt to correct the conduct giving rise to Cause by other less severe action. Dismissal is appropriate if . . . other less severe action is inappropriate and contrary to the best interests of the College because of the nature or seriousness of the conduct." Defs.' L.R. 56.1 Ex. 41 § IX.D.1. Columbia asks the court to conclude that, based on

35

the nature and seriousness of Lerman's actions, it was not required to explore less severe sanctions. The contract terms are open to interpretation, however. Columbia has not provided the court with any evidence or case law to establish what would be considered "ordinary circumstances," instead asking the court to assume that Lerman's conduct was so serious to warrant immediate termination. Without more, that determination is one for the jury, not for the court to make on summary judgment.

Finally, as to the third claimed breach, Columbia posits that Lerman had no right to present testimony by Columbia administrators regarding the solution to the ERC. The Statement of Policy provides:

> The ERC will utilize such procedures as it believes are appropriate to ensure a careful and complete review of all relevant facts. In all cases, the Provost/Senior Vice President will be responsible for presenting to ERC the reasons for the decision to sanction or dismiss the faculty member and may do so in such manner, including the presentation of witnesses, as he or she believes appropriate. The faculty member will have the right to make written and oral statements on his or her own behalf, to present witnesses and written statements by other persons with relevant information as determined by the ERC, and to be accompanied by an adviser of his or her choice who will have only such rights to participate in the proceeding as the ERC determines.

Defs.' L.R. 56.1 Ex. 41 § IX.D.2.b.iii. Although the Provost could decide who he wanted to present in Columbia's case, Lerman had the right "to present witnesses and written statements by other persons with relevant information as determined by the ERC." *Id.* Lerman argues that Columbia prevented her from presenting desired testimony from administrators who would have discussed the solution. DeSalle's testimony suggests that the ERC determined that testimony from DeSalle would be relevant to its review. This is sufficient to raise a question as to whether Lerman's right to present witnesses at the ERC proceeding was violated. Thus, Lerman may

36

only proceed on her breach of contract claim with respect to the second and third alleged breaches.

### E. Defamation

Lerman claims that Carter made defamatory statements to representatives from Rep. Schakowsky's and Sen. Durbin's offices when he stated that Lerman had been terminated for misusing grant funds for a non-permitted purpose. Under Illinois law, "[t]o prove a claim of defamation, a plaintiff must show that the defendant made a false statement concerning plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by defendant, and that plaintiff was damaged." *Gibson* v. *Phillip Morris, Inc.*, 685 N.E.2d 638, 643, 292 Ill. App. 3d 267, 226 Ill. Dec. 383 (1997). Truth is an absolute defense to a defamation action. *Hnilica* v. *Rizza Chevrolet, Inc.*, 893 N.E.2d 928, 931, 384 Ill. App. 3d 94, 323 Ill. Dec. 454 (2008). To prevail on this defense, defendants need only show that the statement at issue is substantially true, *i.e.*, that the "gist" or "sting" of the statement is true. *J. Maki Constr. Co.* v. *Chicago Reg'l Council of Carpenters*, 882 N.E.2d 1173, 1186, 379 Ill. App. 3d 189, 318 Ill. Dec. 50 (2008). "[A]llegedly defamatory material is not actionable even where it is not technically accurate in every detail." *Coghlan* v. *Beck*, 984 N.E.2d 132, 146, 2013 IL App (1st) 120891, 368 Ill. Dec. 407 (2013). Whether a statement is substantially true is normally a jury question, but becomes one of law "where no reasonable jury could find that substantial truth had not been established." *J. Maki Constr. Co.*, 882 N.E.2d at 1186.

Columbia and Carter argue that Carter's statement was substantially true. Lerman's first response is that, at the time these statements were made in October or November 2009, she had only been suspended without pay while the ERC review was pending. Although the ERC was

reviewing the decision, the statement that Lerman had been terminated was substantially true. The October 5 letter inconsistently stated that she was terminated and suspended without pay, but there is no dispute that as of that date, Lerman's relationship with Columbia effectively ended. Although it would have been more technically accurate for Carter to state that Lerman had been suspended without pay, this does not defeat the defense of substantial truth. *See Coghlan*, 984 N.E.2d at 146.

Next, Lerman argues that she has raised a triable issue of whether the implementation of the solution was a misuse of the NCLB grant funds. The solution required that the employees receiving the NCLB grant funds perform work under the grant and make their contributions voluntarily. Lerman admits that she would not have given the NCLB grant funds to Ilio, Morton, or Nalbandian if they did not donate the money to the Malta Conference. This made the distribution of funds conditional and the donations no longer voluntary. As there is no dispute that at least one of the conditions of the solution was not met, there is no triable issue regarding whether the way Lerman implemented the solution was a misuse of the NCLB grant funds. Carter's statement was therefore substantially true, and summary judgment must be granted in Columbia's and Carter's favor on Lerman's defamation claim.

### F. False Light

Lerman has also alleged that Carter's statements regarding the reason for her termination placed her in a false light. To prevail on her false light claim, Lerman must show that (1) she was placed in a false light before the public as a result of Carter's actions; (2) the false light would be highly offensive to a reasonable person; and (3) Carter acted with actual malice, *i.e.*, with knowledge of or reckless disregard for the falsity of the statements. *Wynne* v. *Loyola Univ.*

38

*of Chicago*, 741 N.E.2d 669, 677, 318 Ill. App. 3d 443, 251 Ill. Dec. 782 (2000). Where the statement is substantially true, the first element—being placed in a false light—is not met. *See Pope* v. *Chronicle Publ'g Co.*, 95 F.3d 607, 616 (7th Cir. 1996); *see also Wynne*, 741 N.E.2d at 677 ("Wynne cannot prevail on her false light claim because while there was publication, the assertions made in the Rogers memorandum were 'substantially true.'"). As discussed with respect to Lerman's defamation claim, there is no genuine dispute that Carter's statement was substantially true. Thus, summary judgment is appropriate on Lerman's false light claim.

## II.     Lerman's Motion for Summary Judgment

Columbia filed counterclaims against Lerman on April 24, 2012, alleging breach of fiduciary duty, fraud, and conversion relating to transfers of funds from Columbia to MIMSAD.[17] Columbia initially premised its counterclaims on several alleged actions by Lerman, including failure to disclose her relationship with MIMSAD, approving payments to MIMSAD without disclosing her connection to it, accepting payments as MIMSAD for work she was already being compensated for by her normal salary, and receiving reimbursement from Columbia for expenses related to MIMSAD. Lerman argues that Columbia's claims are time-barred and nonetheless fail because Columbia knew of the alleged conduct and in fact approved of it. Although Lerman focuses solely on whether Columbia had knowledge of her relationship with MIMSAD, Columbia emphasizes that its counterclaims are narrower, focused on Lerman's alleged receipt of double compensation without Columbia's knowledge.

---

[17] Columbia sought leave to file its counterclaims on March 13, 2012.

### A.    Statute of Limitations

Columbia's counterclaims are subject to a five-year statute of limitations.  735 Ill. Comp.

Stat. 5/13-205.  Columbia argues that at least those acts identified in paragraphs 28–33 of its

counterclaim are timely, as they involve payments made to MIMSAD after April 24, 2007 and

thus within five years of Columbia's filing its counterclaim.  But it also argues that it only

discovered Lerman's alleged misconduct in 2011 and thus its counterclaim with respect to all

payments it has identified between 2004 and 2009 are timely.  Lerman, on the other hand, claims

that because Columbia had knowledge of her relationship with MIMSAD as early as 1994, all of

Columbia's claims are time-barred.

The discovery rule applies to the breach of fiduciary duty and fraud claims, so that the

limitations period begins to run "when the plaintiff knew or reasonably should have known that

the injury and that it was wrongfully caused."  *Fuller Family Holdings, LLC* v. *N. Trust Co.*,

863 N.W.2d 743, 756, 371 Ill. App. 3d 605, 309 Ill. Dec. 111 (2007); *see also McWane, Inc.* v.

*Crow Chicago Indus., Inc.*, 224 F.3d 582, 585 (7th Cir. 2000).  Pursuant to the discovery rule,

discovery of the actual injury is not the test; instead, the limitations period begins "when the

injury could have been discovered through the exercise of appropriate diligence," *i.e.* when the

injured party has enough information to put it on inquiry notice to investigate further.  *McWane,*

*Inc.*, 224 F.3d at 585; *Melko* v. *Dionisio*, 580 N.E.2d 586, 591, 219 Ill. App. 3d 1048, 162 Ill.

Dec. 623 (1991).

Illinois courts have not determined whether the discovery rule applies to common law

conversion claims, *see Nelson* v. *Sotheby's Inc.*, 115 F. Supp. 2d 925, 929 (N.D. Ill. 2000),

although Illinois appellate courts have concluded that it does not apply to claims for conversion

of negotiable instruments under the Uniform Commercial Code ("UCC") in the absence of fraudulent concealment, *see Hawkins* v. *Nalick*, 975 N.E.2d 793, 797–97, 2012 IL App (5th) 110553, 363 Ill. Dec. 767 (2012); *Haddad's of Ill., Inc.* v. *Credit Union 1 Credit Union*, 678 N.E.2d 322, 325–26, 286 Ill. App. 3d 1069, 222 Ill. Dec. 710 (1997); *see also Rodrigue* v. *Olin Emps. Credit Union*, 406 F.3d 434, 444–47 (7th Cir. 2005) (discussing rationale for rejecting application of discovery rule to claims of conversion of negotiable instruments).[18]  Several cases have applied the discovery rule (or extensions of it) to conversion claims without much discussion.  *See Lease Resolution Corp.* v. *Larney*, 719 N.E.2d 165, 170–72, 308 Ill. App. 3d 80, 241 Ill. Dec. 304 (1999) (applying adverse domination doctrine, a "common sense application of the discovery rule to a corporate plaintiff," to conversion claim (internal quotation marks omitted)); *Bilut* v. *Nw. Univ.*, 692 N.E.2d 1327, 1333–34, 296 Ill. App. 3d 42, 230 Ill. Dec. 161 (1998) (acknowledging discovery rule in discussing statute of limitations for conversion claims); *Greenberg* v. *Broad Capital Assocs., Inc.*, No. 02 C 6116, 2002 WL 31269617, at *3–4 (N.D. Ill. Oct. 9, 2002) (applying discovery rule to conversion claim).  But others have found that the date of accrual for a conversion claim is simply the date of the conversion itself.  *See Memorylink Corp.* v. *Motorola, Inc.*, No. 08 C 3301, 2009 WL 464338, at *8 (N.D. Ill. Feb. 23, 2009); *Beauchem* v. *Rockford Prods. Corp.*, No. 01 C 50134, 2004 WL 432328, at *1 (N.D. Ill. Feb. 6, 2004); *Nelson* v. *Sotheby's, Inc.*, 115 F. Supp. 2d 925, 929 (N.D. Ill. 2000); *Am. Heavy Trading, Inc.* v. *Gen. Elec. Co.*, No. 93 C 3609, 1996 WL 556742, at *6 & n.7 (N.D. Ill. Sept. 27, 1996)

---

[18] In her reply, Lerman argues that Columbia's citation to *Rodrigue*, 406 F.3d at 443–44, suggests that its conversion claim is one for conversion of negotiable instruments under the UCC.  Claims for conversion of negotiable instruments are governed by a three-year statute of limitations.  810 Ill. Comp. Stat. 5/3-118(g).  But the court does not find Columbia's claim to be one brought under the UCC and thus will analyze it as a common law conversion claim.

("[We] believe the discovery rule would not apply to a conversion claim, because it accrues on the date of the conversion . . . ."). The Illinois Supreme Court has instructed that, "regardless of how an action is characterized," a court should look at "whether the underlying facts support application of the discovery rule." *Hermitage Corp.* v. *Contractors Adjustment Co.*, 651 N.E.2d 1132, 1136, 166 Ill. 2d 72, 209 Ill. Dec. 684 (1995). Here, because Columbia's claims are all based on the same underlying facts and problems of proof are no different with respect to the conversion claim as the other claims, the court will proceed to apply the discovery rule to the conversion claim as well. *See Greenberg*, 2002 WL 31269617, at *3–4 (applying discovery rule to conversion, unjust enrichment, and accounting claims).

Columbia claims that it only learned of Lerman's use of MIMSAD to obtain double compensation in 2011 and that there is no evidence that it should have discovered this earlier. Columbia, however, knew of Lerman's relationship with MIMSAD and that MIMSAD was established to provide payment to Lerman for work she had performed under grant funds from MIMSAD's inception in 1994. *See United States* v. *One Parcel of Land Located at 7326 Highway 45 N*, 965 F.2d 311, 316 (7th Cir. 1992) ("Where a corporate agent obtains knowledge while acting in the scope of his agency, he presumably reports that knowledge to his corporate principal so the court imputes such knowledge to a corporation."); *Bone Care Int'l, LLC* v. *Pentech Pharm., Inc.*, No. 08-cv-1083, 2012 WL 1068506, at *11 (N.D. Ill. Mar. 29, 2012) (knowledge of officers or directors of corporation is imputed to the corporation, collecting cases). Columbia also was aware of payments being made to both Lerman and MIMSAD prior to 2011 and the amounts of those payments. Further, the payment requests for MIMSAD were not occurring solely outside of the academic year and thus could have raised questions regarding

42

double compensation.  But all of this is merely circumstantial evidence.  Whether these facts

alone are inherently suspicious to have placed Columbia on inquiry notice that a potential wrong

was occurring is a question of fact.  *See Marks* v. *CDW Computer Ctrs., Inc.*, 122 F.3d 363,

368–69 (7th Cir. 1997) (whether "bad blood" or "storm warnings" were sufficient to place

someone on inquiry notice of fraud was a question for a trier of fact); *cf. Clark* v. *Robert W.*

*Baird Co.*, 152 F. Supp. 2d 1040, 1045 (N.D. Ill. 2001) (where crucial facts were undisputed and

"compel only one conclusion," deciding statute of limitations issue on summary judgment is

appropriate).  Lerman's argument that, despite the fact that her arrangement with MIMSAD is

generally considered improper in the grant administration world, administrators at Columbia

sanctioned it suggests that it may not have been inherently suspicious.  Further, she admits that

she never kept time records or that she submitted time records to Columbia evidencing the

division of her work as MIMSAD and as a Columbia salaried faculty member.  These

admissions undercut any inference that Columbia would have known from the documents in its

possession that Lerman was receiving double payments for the same work.  *Cf. Team Play, Inc.*

v. *Boyer*, 391 F. Supp. 2d 695, 706–07 (N.D. Ill. 2005) ("A party may not claim the applicability

of the discovery rule where, as here, it asserts that the documents from which it discovered the

alleged mistakes have been in its possession since the time that the payments were made.");

*Clark*, 152 F. Supp. 2d at 1045 (plaintiff's examination of own account statement would have

revealed that he had been wronged where all he "needed to know to determine that he had been

wronged was that he did not authorize [the check] himself").  Instead, there is a question of fact

as to whether a reasonable person would have suspected Lerman was receiving double

compensation for the same work or would have considered those payments to be merely business as usual.[19]

The court does note that, even if a jury were to find that the discovery rule does not apply, Columbia would still have claims for any alleged unlawful transactions that occurred after April 24, 2007. Every receipt of funds that allegedly was a double payment is a discrete act for which Columbia can attempt to recover. *See Rodrigue*, 406 F.3d at 443–44, 447 ("Each instance of conversion is a discrete and actionable wrong . . . ."); *see also Kidney Cancer Ass'n* v. *N. Shore Cmty. Bank & Trust Co.*, 869 N.E.2d 186, 190–94, 373 Ill. App. 3d 396, 311 Ill. Dec. 512 (2007). It does not matter that these transactions are part of "an overall pattern of wrongdoing." *Rodrigue*, 406 F.3d at 443; *see also Belleville Toyota, Inc.* v. *Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 193, 199 Ill. 2d 325, 264 Ill. Dec. 283 (2002) (each allegedly unlawful allocation, "the result of discrete decisions by defendants," although repeated, is a separate violation that could support a separate cause of action). Although Lerman argues that *Rodrigue* is limited to conversion claims under the UCC, the *Rodrigue* court's holding is equally applicable to Columbia's common law conversion claim as well as its breach of fiduciary duty and fraud claims premised on Lerman's alleged receipt of double compensation. Columbia's claims do not depend on a cumulation of wrongful acts. Instead, every time Lerman allegedly received double compensation or made an allegedly false representation, an independently actionable claim arose. Thus, the court will proceed to the merits of Columbia's counterclaims.

_____

[19] Because the court finds there to be a genuine dispute of fact on the issue, it will not pass on whether Columbia is correct in its assertion that 2011 is the earliest that discovery of the double compensation should have occurred.

### B.     Breach of Fiduciary Duty

Under Illinois law, to establish a breach of fiduciary duty claim, Columbia must show that (1) a fiduciary duty existed, (2) that duty was breached, and (3) the breach of the duty proximately caused damages.  *Gross* v. *Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010). Lerman does not dispute that she owed Columbia a duty of loyalty or that that duty prohibited her from engaging in self-dealing and misappropriating Columbia funds.  *See Beltran* v. *Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 831 (N.D. Ill. 2006).  Lerman argues that Columbia cannot show a breach because Columbia was aware of her relationship with MIMSAD and the fact that she was receiving payments through it.  Columbia, on the other hand, argues that there is at least a dispute as to whether she received payments through MIMSAD for work she was performing as a salaried faculty member.  The evidence at least raises a question as to whether Lerman received money both from Columbia in the form of her personal salary and through MIMSAD for the same work, for Lerman admits that she did not keep time records to differentiate between the two.  And despite Lerman's argument that Columbia approved of the arrangement, there is no evidence in the record that Columbia approved of the way the arrangement was carried out.[20]  Similarly, the evidence is disputed as to whether Columbia ratified Lerman's conduct.  Ratification occurs "when the principal with knowledge of the material facts regarding an unauthorized transaction takes a position inconsistent with non-

---

[20] Both sides dance around the issue of double compensation.  Columbia has not submitted any evidence that would demonstrate that Lerman's salary remained the same or increased since MIMSAD was established or that part of Lerman's salary was "funded" by outside grants.  Nor has Lerman submitted evidence that would support the conclusion that her salary from Columbia decreased to reflect the payments she was receiving through MIMSAD.  This makes it difficult for the court to determine whether Lerman received double compensation for the same work, but the facts support at least drawing such an inference in Columbia's favor in deciding this motion.

affirmation of the transaction." *Stathis* v. *Geldermann, Inc.*, 630 N.E.2d 926, 932–33, 258 Ill. App. 3d 690, 196 Ill. Dec. 761 (1994). Here, Columbia did continue issuing checks to MIMSAD, even though it knew MIMSAD was related to Lerman. There is a dispute, however, as to whether Columbia was aware of all the material facts surrounding Lerman's requests for payment for MIMSAD, *i.e.*, whether it knew Lerman was receiving compensation through two different sources for the same work. Thus, summary judgment on Columbia's breach of fiduciary duty claim is denied.

### C.    Fraud

To prevail on its fraud claims, Columbia must establish that (1) Lerman made a false statement or omission of material fact, (2) Lerman knew of or believed in its falsity, (3) Lerman intended to induce Columbia to act, (4) Columbia acted in reliance on the truth of Lerman's statements, and (5) damages resulted from Columbia's reliance. *Weidner* v. *Karlin*, 932 N.E.2d 602, 605, 402 Ill. App. 3d 1084, 342 Ill. Dec. 475 (2010). For an omission to be actionable, Columbia must also show the existence of a special or fiduciary relationship that gives rise to a duty to speak. *Id.* Columbia's argument is essentially that Lerman fraudulently misrepresented the work she was doing as MIMSAD so that she received additional compensation for work she was already being compensated for with her regular salary. As discussed above, there is at least a question as to whether this was the case. Thus, Lerman's motion for summary judgment on the fraud claims is denied.[21]

---

[21] The court questions whether the remaining elements of Columbia's fraud claim can be met. But because Lerman has not raised any argument with respect to these elements, the court may not pass on the issue at this time. *See Sublett* v. *John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *see also Cloe* v. *City of Indianapolis*, 712 F.3d 1171, 1182 (7th Cir.

### D. Conversion

To prevail on its conversion claim, Columbia must establish that it (1) has a right to the property, (2) it has an absolute and unconditional right to immediate possession of the property, (3) it made a demand for possession, and (4) Lerman wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione* v. *Johnson*, 703 N.E.2d 67, 70, 184 Ill. 2d 109, 234 Ill. Dec. 455 (1998). Again, Lerman argues that she had authorization for the payments she received through MIMSAD. But the issue is not whether Columbia knew that payments were being made to MIMSAD and that MIMSAD was Lerman's corporation. It is instead whether Lerman was authorized to receive funds through MIMSAD for work she was also being compensated for through her Columbia salary. Although White stated that it was "common knowledge" that, in addition to receiving her Columbia salary, Lerman, through MIMSAD, was receiving payments from grant funds, this does not establish that Columbia knew that she was receiving payments twice for the same work or that doing so was authorized. White's further statements that additional compensation was provided for work done after hours or in the summer suggests that payments for additional work may have been authorized. But whether payments were made to MIMSAD for such "additional" work or for work that was part of Lerman's duties as a Columbia professor is disputed. Because there is a question of fact on the issue, summary judgment will be denied on Columbia's conversion claim.

---

2013) (district court should not have addressed pretext where defendant did not raise the argument in support of its motion for summary judgment on ADA claim).

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' motions [#161, 164] are granted with respect to Counts VI and VII and Count I as to Kelly. Their motions are denied with respect to Counts I as to Columbia, Turner, Carter, and Kapelke and Counts II, III, IV, and V. Count IV is limited to the alleged breaches of failing to correct the alleged conduct by less severe action than termination and refusing to allow oral testimony by Columbia administrators about the solution before the ERC. Lerman's motion [#166] is denied. This case will be called for a status hearing on September 26, 2013 at 8:30 a.m. The parties are directed to engage in a sincere effort to settle this case and to report their progress at the status hearing.

Dated: August 21, 2013              Enter: _____
                                           JOAN HUMPHREY LEFKOW
                                           United States District Judge